1

2  KEVIN W. ALEXANDER (SBN 175204)
   RICHARD R. SPIRRA (SBN 106361)
   GORDON & REES LLP
3  101 W. Broadway, Suite 2000
   San Diego, CA 92101
4  Telephone: (619) 696-6700
   Facsimile: (619) 696-7124

5

6  MANUEL S. SALDANA (SBN 137060)
   GORDON & REES LLP
   633 W. 5th Street, Ste. 4900
7  Los Angeles, CA 90071
   Telephone: (213) 576-5000
8  Facsimile: (213) 680-4470

9  Attorneys for Defendant
   BIC USA, INC.

10

11             **UNITED STATES DISTRICT COURT**

               **SOUTHERN DISTRICT OF CALIFORNIA**

12

13  DONNA R. NELSON, an individual and )   CASE NO.: 3:07-cv-2367 LAB RBB
    on behalf of the general public,        )
14                                          )
                                            )
15                    Plaintiff,            )   **REQUEST FOR JUDICIAL**
                                            )   **NOTICE IN SUPPORT OF**
16     vs.                                  )   **DEFENDANT BIC USA, INC.'S**
                                            )   **MOTION TO DISMISS THE**
                                            )   **FIRST AMENDED COMPLAINT**
17  BIC USA, INC., a Delaware corporation,  )
    and DOES 1 through 100, inclusive,      )
18                                          )
                      Defendants.           )
19                                          )   Date: September 8, 2008
                                            )   Time: 11:15 a.m.
20                                          )   Courtroom: 9
                                            )   Judge: Hon. Larry A. Burns
21                                          )
                                            )
22  _____    )

23        Defendant BIC USA, Inc, ("BIC") hereby requests that this Court take

24  judicial notice, pursuant to Rule 201 of the Federal Rules of Evidence, of the

25  following matters and documents cited and submitted to this Court in support of its

26  Motion To Dismiss The First Amended Complaint:

27        1.    The findings, actions and analysis of the Federal Trade Commission

28  set forth in the FTC Report entitled: *"Made in USA" and Other U.S. Origin*

- 1 -

1    *Claims*, Federal Register vol. 62, no.231, part III, pages 63756-63771 (Dec.2,

2    1997), a copy of which  is attached hereto as Ex. "A";

3            2. The testimony set forth in support of H.R. 3355 that is contained  in the

4    Congressional Record's transcript of the minutes of the  Congressional hearing on

5    July 26, 1994, a copy of which is attached hereto as Exhibit  "B";

6            3. The Federal Trade Commission's publication entitled *Complying with the*

7    *Made In the USA Standard,* a copy of which is attached hereto as Exhibit "C,"

8    taken from the FTC internet website.

9

10

11   Dated:  July 7, 2008                    GORDON & REES LLP

12

13                                           By: _____
                                                 Kevin W. Alexander
14                                               Richard R. Spirra
                                                 Manuel S. Saldana
15                                               Attorneys for Defendant BIC USA,
                                                 INC.
16

17

18

19

20

21

22

23

24

25

26

27

28

BICC/1048462/5357913v.1

REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF DEFENDANT BIC USA, INC.'S MOTION TO
DISMISS THE FIRST AMENDED COMPLAINT
CASE NO.:  3:07-cv-2367 LAB RBB

Exhibit "A"



**Tuesday**
**December 2, 1997**

Part III

# Federal Trade Commission

"Made in USA" and Other U.S. Origin
Claims; Notice

## FEDERAL TRADE COMMISSION

## "Made in USA" and Other U.S. Origin Claims

**AGENCY:** Federal Trade Commission.

**TITLE:** Enforcement Policy Statement on U.S. Origin Claims.

**ACTION:** Notice of Issuance of Enforcement Policy Statement on U.S. Origin claims.

**SUMMARY:** The Federal Trade Commission ("FTC" or "Commission") has conducted a comprehensive review of "Made in USA" and other U.S. origin claims in product advertising and labeling. Historically, the Commission has held that a product was *wholly domestic* or *all or virtually all* made in the United States to substantiate an unqualified "Made in USA" claim. As part of this review, which began in 1995, the Commission sought public comment and conducted a two-day public workshop.

On May 7, 1997, the Commission solicited public comment on Proposed Guides for the Use of U.S. Origin Claims ("Proposed Guides"). Under the Proposed Guides, a marketer making an unqualified U.S. origin claim would have been required to have a reasonable basis substantiating that the product was *substantially all* made in the United States. To give further guidance as to what constitutes a reasonable basis for making a "Made in USA" claim, the Proposed Guides set forth two "safe harbors" under which an unqualified U.S. origin claim would not be considered deceptive.

The Proposed Guides also addressed qualified claims, claims regarding specific processes and parts, multiple-item sets, and changes in cost and sourcing. They also would have authorized specific origin claims for certain products that are both sold domestically and exported.

After extensively reviewing comments received regarding the Proposed Guides, the Commission has determined not to adopt the Proposed Guides. Instead, the Commission will continue to enforce the Commission's current "all or virtually all" standard. The Enforcement Policy Statement on U.S. Origin Claims that appears at the end of this notice outlines the Commission's enforcement policy in this area and provides additional guidance to marketers wishing to make an unqualified "Made in USA" claim under the "all or virtually all" standard. The statement also provides guidance on the use of qualified claims.

**EFFECTIVE DATE:** December 1, 1997.

**FOR FURTHER INFORMATION CONTACT:** Beth M. Grossman, Attorney, Division of Advertising Practices, Bureau of Consumer Protection, Federal Trade Commission, Washington, DC 20580, telephone 202–326–3019, or Kent C. Howerton, Attorney, Division of Enforcement, Bureau of Consumer Protection, Washington, DC 20580, telephone 202–326–3013.

**SUPPLEMENTARY INFORMATION:**

### I. Introduction

The Commission regulates claims of U.S. origin, such as "Made in USA," pursuant to its statutory authority under section 5 of the Federal Trade Commission Act, which prohibits "unfair or deceptive acts or practices." Cases brought by the Commission beginning over 50 years ago established the principle that it was deceptive for a marketer to promote a product with an unqualified "Made in USA" claim unless that product was wholly of domestic origin.[1] In two 1994 cases, the Commission rearticulated this standard to require that a product advertised as "Made in USA" be "all or virtually all" made in the United States.[2] Whether the standard was called "wholly domestic" or "all or virtually all," however, unqualified claims of domestic origin have been treated as claims that the product was in all but *de minimis* amounts made in the United States.[3]

In a July 11, 1995 press release, the Commission announced that it would undertake a comprehensive review of U.S. origin claims and examine whether the Commission's traditional standard for evaluating such claims remained consistent with consumer perceptions and continued to be appropriate in today's global economy.[4] On October 18,

---

[1] *See, e.g., Windsor Pen Corp.,* 64 F.T.C. 454 (1964); *Vulcan Lamp Works, Inc.,* 32 F.T.C. 7 (1940).

[2] This language was first used in the cases of *Hyde Athletic Industries,* File No. 922–3236 (consent agreement accepted subject to public comment Sept. 20, 1994) and *New Balance Athletic Shoes, Inc.,* Docket No. 9268 (complaint issued Sept. 20, 1994). In light of the decision to review the standard for U.S. origin claims, the Commission later modified the complaints in these cases to eliminate the allegations based on the "all or virtually all" standard. Consent agreements based on these revised complaints were issued on December 2, 1996 (*New Balance*) and December 4, 1996 (*Hyde*).

[3] In this notice, the Commission refers to its traditional standard as the "all or virtually all" standard.

[4] The Commission initiated its review in part because of comments from the public on the consent agreement the Commission had accepted (subject to final action) with Hyde, and letters from more than 40 members of Congress who wrote to the Commission or Chairman Robert Pitofsky urging that the Commission review and revise its standard.

1995, the Commission published a notice in the **Federal Register** soliciting public comment on various issues related to this review, and announcing that Commission staff would conduct a public workshop on this topic. 60 FR 53922 (1995).[5] Contemporaneous with the solicitation of public comment, the Commission commissioned a two-part study to examine consumer understandings of U.S. origin claims. On March 26 and 27, 1996, representatives of industry, consumer groups, unions, government agencies, and others participated in the public workshop, which focused on consumer perception of U.S. origin claims and a discussion of the costs and benefits of various alternative standards for evaluating such claims. Following the workshop, the Commission, in a notice published on April 26, 1996, extended the period for clarifying or rebuttal comments until June 30, 1996, and set forth additional questions for comment. 61 FR 18600 (1996).

After reviewing the consumer perception evidence, the public comments, and the workshop proceedings, the Commission proposed, in a notice published on May 7, 1997, to adopt Guides for the Use of U.S. Origin Claims and sought public comment on the Proposed Guides until August 11, 1997. 62 FR 25020. Under the Proposed Guides, a marketer making an unqualified claim of U.S. origin, at the time it makes the claim, would have to possess and rely upon a reasonable basis that the product is *substantially all* made in the United States. To assist manufacturers in complying with this standard, the Proposed Guides also set forth two alternative "safe harbors" under which an unqualified U.S. origin claim would not be considered deceptive. The first safe harbor encompassed products that were last substantially transformed in the United States and whose U.S. manufacturing costs constituted 75% of total manufacturing costs ("75% U.S. content safe harbor"). The second safe harbor applied to products that have undergone two levels of substantial transformation in the United States: *i.e.,* the product's last substantial transformation took place in the United States, and the last substantial transformation of each of it significant inputs took place in the United States ("two levels of substantial

---

[5] A follow-up notice published on December 19, 1995 announced that the public workshop would be held on March 26 and 27, 1996, and stated that the record would be held open for post-workshop public comments until April 30, 1996. 60 FR 65327 (1995).

transformation safe harbor").[6] The Proposed Guides also addressed various qualified claims, claims regarding specific processes and parts, multiple-item sets, and the effects of changes in costs and sourcing. They further provided for an alternative origin claim for certain products that are both sold domestically and exported.

In response to the Proposed Guides, the Commission received 1,057 written comments.[7] After reviewing the public comments, the Commission has decided that it will not adopt the Proposed Guides, but instead will continue to enforce the Commission's current "all or virtually all" standard. In conjunction with this decision, the Commission is issuing an Enforcement Policy Statement on U.S. Origin Claims which provides additional guidance to marketers seeking to make "Made in USA" and similar claims. The Enforcement Policy Statement appears at the end of this notice.

## II. Summary of Comments On Proposed Guides

### A. General Information

The total of 1,057 comments represented 1,165 commenters, including 963 individual consumers, 24 members of Congress, 2 consumer organizations, 1 non-profit organization, 90 manufacturers or other corporations, 29 trade associations, 29 labor unions and union representatives, 23 state and local government representatives (including a coalition of 16 state Attorneys General), and 4 others.

### B. Comments Supporting the All or Virtually All Standard

The vast majority of the individual consumers as well as 130 other

commenters opposed the Proposed Guides as setting too low a standard and/or expressly supported the current "all or virtually all" standard. These included a coalition of 16 Attorneys General,[8] 13 members of Congress,[9] 5 state legislators,[10] 1 state General Assembly,[11] 1 City Council,[12] 6 trade associations,[13] 2 consumer groups,[14] 29 labor unions or union representatives,[15]

[8] This comment was submitted by the Attorneys General of Connecticut, California, Florida, Iowa, Illinois, Michigan, Missouri, North Carolina, New Jersey, Nevada, New York, Pennsylvania, Rhode Island, Tennessee, Washington, and Wisconsin ("AGs"). #462. In addition, Jeremiah Nixon, Attorney General of Missouri ("Nixon") submitted a separate comment, #63.

[9] U.S. Sen. Dale Bumpers ("Bumpers"), #74; U.S. Rep. Mark W. Neumann and U.S. Rep. Tom Latham ("Neumann/Latham"), #75; U.S. Rep. James A. Traficant, Jr. ("Traficant"), #231; U.S. Rep. Peter J. Visclosky ("Visclosky"), #236; U.S. Rep. Earl F. Hilliard ("Hilliard"), #242; U.S. Sen. Carl Levin ("Levin"), #254; U.S. Rep. Virgil H. Goode, Jr. ("Goode"), #24; U.S. Rep. Sherrod Brown ("Brown"), #599; U.S. Rep. Bob Franks and U.S. Rep. John D. Dingell ("Franks/Dingell"), #670, ("Dingell"), #684 (noting his past opposition to weakening the all or virtually all standard and requesting that the Commission respond to specific questions about the Proposed Guides; with attached response from the Commission's staff); U.S. Rep. John Oliver ("Oliver"), #671A; U.S. Rep. Bruce F. Vento ("Vento"), #735. U.S. Rep. Tom Campbell ("Campbell") submitted a comment conveying the concerns of constituents, but did not take a position himself. Campbell, #283. A number of other members of Congress forwarded comments from their constituents.

[10] North Carolina Rep. William S. Hiatt ("Hiatt"), #196; North Carolina Sen. Fountain Odom ("Odom"), #290; Illinois Rep. Michael J. Boland ("Boland"), #468; North Carolina Rep. Wayne Goodwin ("Goodwin"), #508; Pennsylvania Rep. Richard D. Olasz ("Olasz"), #623.

[11] New Jersey General Assembly ("NJ Assembly"), #740.

[12] City of Titusville, FL ("Titusville"), #1047.

[13] American Export Ass'n ("American Export"), #201; The American Hand Tool Coalition ("American Hand Tool"), #622; American Iron & Steel Institute ("AISI"), #636; Tile Council of America, Inc. ("TCA"), #618; American Textile Manufacturers Institute ("ATMI"), #615; Crafted with Pride in USA Council, Inc. ("Crafted With Pride"), #469. Despite the exclusion of textile products from the Proposed Guides, four additional trade associations filed comments urging the Commission to maintain the existing standards under the Textile Products Identification Act, 15 U.S.C. 70, for "Made in USA" claims for garments and other textile products. American Apparel Manufacturers Ass'n ("AAMA"), #697; Clothing Manufacturers Ass'n of USA ("CMA"), #624; Garment Contractors Ass'n of Southern California ("GCASC"), #895; Knitted Textile Ass'n ("KTA"), #634.

[14] National Consumers League ("NCL"), #640; Wisconsin Citizen Action ("WI Citizen Action"), #991.

[15] Alabama AFL–CIO ("Alabama AFL–CIO"), #242; Connecticut Employees Union Independent, Local 511, AFL–CIO ("CEUI Local 511"), #870; East Central Ohio Building & Construction Trades Council, AFL–CIO ("Construction Trades"), #687; Food & Allied Service Trades AFL–CIO ("FAST"), #545; Hotel Employees & Restaurant Employees Local 74, AFL–CIO ("HERE Local 74"), #255; Int'l Ass'n of Firefighters, West Hartford Fire Fighters Ass'n, Local 1241 ("Firefighters Local

58 manufacturers and other corporations,[16] and 3 other

1241"), #742; Int'l Ass'n of Machinists & Aerospace Workers, Air Transport Lodge 1056 ("Machinists Lodge 1056"), #558; Int'l Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers & Helpers, AFL–CIO ("Boilermakers"), #514; Int'l Brotherhood of Electrical Workers, Local 1040, AFL–CIO ("IBEW Local 1040"), #745; Int'l Brotherhood of Electrical Workers, Local 540, AFL–CIO ("IBEW Local 540"), #686; Int'l Union, United Automobile, Aerospace & Agriculture Implement Workers of America—UAW ("UAW"), #615; Montana State AFL–CIO ("MT AFL–CIO"), #459; Permian Basin Central Labor Union, AFL–CIO ("PBCLU"), #388, #418; Seattle Professional Engineering Employees Ass'n ("SPEEA"), #830, #944; UAW—Region 9A ("UAW Region 9A"), #682; Union Label & Service Trade Department, Plumbers & Steamfitters Local 565, AFL–CIO ("Plumbers & Steamfitters Local 565"), #209; Union Label & Service Trades Department, AFL–CIO ("AFL–CIO/ULSTD"), #608; Union of Needletrades, Industrial & Textile Employees, AFL–CIO, CLC ("UNITE"), #696; United Food & Commercial Workers, Local 26, AFL–CIO ("UFCW Local 26"), #897; United Paperworkers Int'l Union, AFL–CIO, CLC ("Paperworkers"), #255; Communications Workers of America, Local 3104, AFL–CIO ("CWA Local 3104"), #688; Hartford Federation of School Secretaries ("School Secretaries"), #843; Int'l Union of Electronic, Electrical, Salaried, Machine and Furniture Workers, Furniture Workers Division, AFL–CIO ("Furniture Workers"), #508; UAW Local 977, Buy American Committee ("UAW Local 977"), #651; UAW, Amalgamated Local 644 ("UAW Local 644"), #54; UAW, Local 145 ("UAW Local 145"), #913; United Steelworkers of America, Local 9189, AFL–CIO ("Steelworkers Local 9189"), #895; United Steelworkers of America, Rubber/Plastic Industry Conference, Local 2, District 1, AFL–CIO, CLC ("Steelworkers Local 2"), #1017; Brewery and Soft Drink Workers, Liquor Drivers, and New and Used Car Workers, Teamsters Local Union 1040 ("Teamsters Local 1040"), #1052.

[16] A&E Manufacturing Co. ("A&E"), #991; ABCO Industries, Inc. ("ABCO"), #743; American Sigma ("American Sigma"), #661; Ben Forman & Sons, Inc. ("Forman"), #159; BOYT ("BOYT"), #959; Calibre, Inc. ("Calibre"), #991; Centerville Lumber Co. ("Centerville"), #152, #734; Cheraw Yarn Mills, Inc. ("Cheraw"), #716; Danaher Tool Group ("Danaher"), #991; D.E. Williams Co. ("Williams"), #1031; Duchess Industries ("Duchess"), #512; Durand Int'l ("Durand"), #471; Dyersburg Corp. ("Dyersburg"), #720; Dynacraft Industries, Inc. ("Dynacraft"), #646; Elco Textron ("Elco"), #970; Equity Services of Connecticut, Inc. ("Equity Services"), #1001; Exidyne Instrumentation Technologies, Inc. ("Exidyne"), #731; Federal Forging Tools ("Federal"), #654; Friend Laboratory ("Friend"), #34; GBW Manufacturing, Inc. ("GBW"), #1014; Gee Kay—Knit Products ("Gee Kay"), #1034; Herker Industries ("Herker"), #991; Inman Mills ("Inman"), #981; Jackson Products ("Jackson"), #880; Joshua L. Baily & Co., Inc., ("Baily"), #53; Kenosha Leatherette & Display Co. ("Kenosha"), #991; Kern Special Tools Co., Inc. ("Kern"), #739; Madewell Machine Works Co., Inc. ("Madewell"), #958; March Instruments, Inc. ("March"), #46; Matco Tools ("Matco"), #600; Merit Abrasives ("Merit"), #628; Murphy & Co. ("Murphy"), #64; Newco Valves ("Newco"), #198; NTP-Republic ("NTP"), #699; Nucor Steel ("Nucor"), #992; Piedmont Clarklift, Inc. ("Piedmont"), #741; Protexall, Inc. ("Protexall"), #917; Regal-Beloit Corp. ("Regal-Beloit"), #614; Richland Mills ("Richland"), #626; Schofield ("Schofield"), #51; SGS Tool Co. ("SGS"), #221; Sharpe Manufacturing Co. ("Sharpe"), #630; Sheffield Steel Corp. ("Sheffield"), #935; SidaMerica LLC ("SidaMerica"), #246; Snap-on Tools ("Snap-on"), #685, #732, #733, #991; Spectronics Corp.

Continued

---

[6] "Substantial transformation" is a U.S. Customs Service term that refers to a manufacturing or other process that results in a new and different article of commerce, having a new name, character, and use that is different from that which existed prior to the processing. See 59 FR 141 (1994).

[7] This number reflects those comments received at the time this notice was prepared; additional comments on this matter continue to be submitted to the Commission. The comments have been filed on the Commission's public record as Document Nos. B21902700001, B21902700002, etc. The comments are cited in this notice by the name of the commenter, a shortened version of the comment number, and the relevant page(s) of the comment, e.g., AGs, #462, at 2. All written comments submitted (including those received after the preparation of this notice), as well as a list of commenters (through #1057), are available for public inspection on normal business days between the hours of 8:30 a.m. to 5:00 p.m. at the Public Reference Room, Room 130, Federal Trade Commission, 6th and Pennsylvania Ave., N.W., Washington, DC 20580. In addition, the comments received, and other materials relevant to this review, are available to the public through the Commission's World Wide Web site (http://www.ftc.gov).

commenters.[17] In addition to the individual consumer comments, 7 individual commenters or groups submitted petitions urging the Commission to retain the "all or virtually all" standard that were signed by a total of more than 11,000 individuals.[18] Last, the Commission received over 200 telephone calls from individual consumers who stated their opposition to the Proposed Guides.[19]

In addition, over 200 members of the House of Representatives have cosponsored House Concurrent Resolution 80 ("Resolution"), opposing the Proposed Guides and urging the Commission to retain the "all or virtually all" standard.[20] The Resolution states that lowering the current standard "will be a misrepresentation to consumers in the United States who presently believe products bearing the 'Made in USA' label were all or virtually all made in the United States," and that American consumers are "entitled to purchase products with the understanding that the labels on these products reflect consistent definitions." Accordingly, the Resolution "urges the Federal Trade Commission to refrain

from lowering this standard at the expense of consumers and jobs in the United States." The Made in USA Coalition, comprised of 3 consumer groups, 32 labor unions, 15 businesses, and 11 agriculture organizations, and a primary backer of the House Resolution, submitted a comment expressly supporting it.[21] In addition, members of the Senate recently introduced Senate Concurrent Resolution 52, which also supports the retention of the "all or virtually all" standard. Similarly, the New Jersey General Assembly and the Titusville (Florida) City Council adopted resolutions that ask the Commission to maintain the traditional standard.[22]

The consumer commenters overwhelmingly opposed the Proposed Guides and generally supported an "all or virtually all" standard or advocated a specific percentage, usually 90% or, more often, 100%. Many commenters stated that "'Made in USA' means what it says" or expressed similar sentiments. Several commenters asserted that changing the current standard would confuse consumers who wish to buy American products, leaving them unable to determine whether a product was truly made in the United States. Individual consumers also stated that they buy American products to support fellow Americans and expressed concern that lowering the standard would lead to a loss in American jobs. The following comments exemplify the individual consumer comments:

The concept of "Made in the USA" has been specific and definite for the last 50 years. Please leave it as it is. If manufacturers want to say an item is "Made in the USA"; then, make sure it is exactly that. "Made in the USA" should mean that an item is 100% manufactured in the United States of America and not in another country.[23]

If a product is only partially made in our Country, I want to know. I do not wish to purchase items made in other countries and falsely labeled "Made in America." I want the entire truth on the label. I don't want to be tricked into buying an item I think is made here when in fact it is not.[24]

We are opposed to any change that would increase the percentage of foreign labor or materials in those goods or products bearing the "Made in the USA" label. The American people recognize goods or products bearing this label as being superior in workmanship and quality. These goods and products are produced by American workers * * * Any action by the FTC to modify the "Made in

USA" label standard will lead to the loss of American jobs.[25]

Other commenters echoed the consumers' concerns and cited additional reasons for keeping the "all or virtually all" standard. Several opponents of the Proposed Guides expressed concern that altering the current standard would deceive, or at least confuse, consumers.[26] Some of these commenters argued that the consumer perception evidence before the Commission does not support lowering the standard.[27] Some commenters additionally asserted that consumer attitudes and preferences towards "Made in USA" products have not been altered by a change in the economy, or, if anything, have been made stronger.[28]

Other advocates of the "all or virtually all" standard warned that changing the standard in the way proposed by the Commission would harm the American manufacturing base, because companies would have less incentive to use U.S. labor and U.S. product components. These commenters concluded that American jobs would be jeopardized as companies increasingly would rely on less expensive foreign sources.[29] Many commenters also stated that weakening the standard would

[17] ("Spectronics"), #631; Spray Cotton Mills ("Spray Cotton"), #672; Sterling Handling Equipment, Inc. ("Sterling"), #625; Taytronics Corp. ("Taytronics"), #744; Vaughn & Bushnell Manufacturing Co. ("Vaughn & Bushnell"), #151, #616; Victoria Vogue, Inc. ("Victoria"), #1045; The Warren Featherbone Co. ("Featherbone"), #1015; Waukesha Industrial Supply ("Waukesha"), #991; Weldbend Corp. ("Weldbend"), #597; Wolfe Dye & Bleach Works, Inc. ("Wolfe"), #1057, Wright Tool Co. ("Wright"), #262, #652; Yeoman's Chicago Corp. ("Yeoman's"), #216. See also Eastman Kodak Co. ("Kodak"), #619 (supporting 85% standard).

[18] Made in USA Coalition ("MUSA Coalition"), #596; Donald P. Selkirk (submitted as Executive Producer, The Donald P. Selkirk Show, WPON Radio, Bloomfield Hills, MI) ("Selkirk"), #186; Women V.I.P.s ("WVIP"), #1042.

[19] Brown, #599 (petition containing approximately 9,300 signatures submitted by U.S. Rep. Sherrod Brown); John Moore ("John Moore"), #195 (petition signed by 26 individuals); UAW Local 977, #651 (petition containing approximately 2,000 signatures submitted by a union representative); Ellen Sofranski ("Sofranski"), #703 (petition signed by 28 individuals); Employees of Danaher Tool Group ("Danaher Employees"), #829 (petition containing 181 names submitted by employees of Danaher Tool Group); David Micola ("Micola"), #966 (petition containing 151 names submitted by an individual who is a sheet metal worker); Richard Moran, Jr. ("Moran"), #1029 (petition signed by 28 individuals).

[19] These telephone calls have not been memorialized or codified on the record because many of them were phone mail messages without the name, telephone number, or address of the caller.

[20] This number includes at least 13 members of Congress who were among those who had earlier written to the Commission or submitted public comments asking the Commission to lower the "all or virtually all" standard. See supra note 4. The Resolution was submitted to the Commission by U.S. Representatives Bob Franks and John D. Dingell. Franks/Dingell, #670.

[21] MUSA Coalition, #596.

[22] NJ Assembly, #740 (Assembly Resolution No. 163); Titusville, #1047 (Resolution No. 39–1997).

[23] Kenneth Fletcher ("Fletcher"), #178, at 1.

[24] Margaret A. Stem ("Stem"), #203, at 1.

[25] Edwin and Beverly Emmons ("Emmons"), #288, at 1.

[26] See, e.g., Baily, #53; Nixon, #63; Traficant, #231; Crafted With Pride, #469; ATMI, #613; Vaughan & Bushnell, #616; Weldbend, #597; Exldyne, #731; UAW, #615.

[27] See, e.g., American Hand Tool, #622; UAW, #615; Dynacraft, #646; AGs, #462; Weldbend, #597; Bumpers, #74.

[28] See, e.g., Vento, #735 at 1 ("The decline of America's manufacturing base and the difficulty of ascertaining a product's origin in the global marketplace, has in fact rendered the Made in USA claim more valuable and significant to American consumers wishing to buy American."); AISI, #636, at 1 (It is "highly likely that the vast majority of U.S. consumers would be *unaware* of a change in the standard, and would continue to believe that items labeled 'Made in USA' were held to the current standard."); NCL, #640, at 3 (the fact that the economy is increasingly globalized may cause consumers to place even a greater value on unqualified 'Made in USA' claims); Bumpers, #74, at 1–2 ("Even if fewer products are wholly 'Made in the USA,' it does not follow that the meaning of the phrase has changed—rather, that fewer products may meet the standard."); UNITE, #696, at 3 ("no credible evidence * * * that American consumers expect the 'Made in USA' label to mean that products were produced somewhere else").

[29] E.g., SGS, #221, at 1 (U.S. jobs will be in jeopardy if Commission adopts proposed standard); Alabama, #242, at 1 (American workers are already badly injured by unfair exportation of jobs by other employers); Boilermakers, #514; Plumbers & Steamfitters Local 565, #209, at 1 ("purchasing products displaying the 'Made in U.S.A.' label is the first line of defense for American workers to protect their jobs"). See also PBCLU, #418; AFL–CIO/ULSTD, #608; Vaughan & Bushnell, #616; AISI, #636; UAW Region 9A, #682; Cheraw, #716; Bumpers, #74; Yeomans, #216; Odom, #290.

deny manufacturers whose products were, in fact, "all or virtually all" made in the United States the marketing advantage attributable to labeling products "Made in USA."[30]

A number of commenters opposed to the Proposed Guides also contended that it is not necessary to change the standard in order to permit sellers of products made with some foreign parts or labor to inform consumers of their products' U.S. content. These commenters argued that the current standard allows marketers to make qualified claims for products that are made with some foreign parts or labor as long as those claims are truthful and substantiated.[31]

In addition, some of the commenters supporting the "all or virtually all" standard specifically criticized the particular safe harbors proposed by the Commission, arguing that neither proposed safe harbor would ensure that a product complies with the proposed "substantially all" standard and with consumer expectations regarding "Made in USA" claims.[33]

Specifically, several commenters argued that the 75% U.S. content safe harbor (expressed as a percent of total manufacturing costs), in addition to being too low to meet consumer expectations, would allow a "Made in USA" claim for products with far less than even 75% U.S. content (in terms of, for example, the percentage of components). UAW, for example, contended that lower foreign labor costs would lead to underestimating the actual amount of foreign content in a product.[34] In addition, the American Hand Tool Coalition argued that, because the Proposed Guides do not necessarily require marketers to take into account materials several steps back in the manufacturing process or to take into account foreign content that is not "significant" (which is left undefined), marketers may fail to account for all foreign costs.[35]

A number of commenters also specifically criticized the two levels of substantial transformation safe harbor, arguing that this safe harbor does not guarantee that "substantially all" of the labor and value of the product is of domestic origin.[36] A few of these commenters expressed concern that, because this safe harbor does not take into account the cost of U.S. processing or inputs, products could be labeled "Made in USA" even though foreign content accounted for a significant percentage of their value.[37] Two

commenters additionally argued that consumers would be misled by the two levels of substantial transformation safe harbor, because it is too imprecise to ensure that "substantially all" the value of a product is of U.S. origin. UAW stated that "[t]he variation from product to product in the impact of the double transformation test would prevent consumers from having a real sense of the U.S. content of the product that is being presented as 'Made in USA.' "[38] Similarly, the American Hand Tool Coalition contended that this safe harbor leads to conflicting or unpredictable results, in part, because the Proposed Guides define substantial transformation to include two tests that are not consistent for all products—the case-by-case analysis that Customs applies to products from most countries and the tariff shift regulations that Customs applies to products from NAFTA countries.[39]

Finally, some commenters supported a percentage content standard greater than the 75% safe harbor proposed by the Commission, but less than 100%. For example, a coalition of 16 state Attorneys General, as well as a few manufacturers, who were generally supportive of an "all or virtually all" standard, recommended that the Commission require that a product have at least 90% actual U.S. content in order to bear an unqualified "Made in USA" label.[40] Another commenter, Eastman Kodak, favored an 85% standard, stating that although the "all or virtually all" standard affords the best guarantee against consumer deception or confusion, "legitimate disadvantages [may be placed] on businesses who are very heavily committed to maintaining manufacturing processes here but cannot ignore the economic realities of using at least some foreign components" or who must import items which are not made, or raw materials which are not found, in the United States.[41] According

---

[30] E.g., Weldbend, #597, at 1 (the Proposed Guides "would force most of Weldbend's fittings and flanges—made all or virtually all of American materials by American workers—to share their hard-earned 'Made in USA' labels with competitors' products having less than 50-percent U.S. content value"). See also Vento, #735; Matco, #600; Duchess, #512; Merit, #628; Sharpe, #630; Spectronics, #631; Federal, #654; Exidyne, #731; NTP, #699; Forman, #159; Traficant, #231.

[31] See, e.g., NCL, #640; Visclosky, #236; Traficant, #231; Boilermakers, #514; FAST, #545; UNITE, #696; Schofield, #51; AFL–CIO/ULSTD, #608. In addition, a few individual consumers also suggested that marketers can make qualified claims for their products. See, e.g., Matthew Fogarty ("Fogarty"), #997 (for products with less than 100% U.S. content, should specify percentage of U.S. content, such as "Materials 50% Made in USA, Assembled in Guam"); Anthony J. Jordan ("Jordan"), #160 (supports disclosing the specific percentages of U.S. and foreign materials and labor); Lawrence P. Kosel ("Kosel"), #207 (supports disclosing on labels the percentage of the product made in America, such as "70% made in America"); Arthur Lazur ("Lazur"), #119 (should state percentage or exact materials made in USA; or that assembled, but not manufactured, in USA); R.W. and Susan Marchand ("Marchand"), #107 (for products partially produced in USA, should identify percentage made in USA); Debra Newman ("Debra Newman"), #123 (supports qualified claims such as "Made in USA of imported parts" or "Assembled in [name of country] from US parts"); Alan D. Shrom ("Shrom"), #141 (should state on the product if it is assembled in USA of foreign materials); Robert Lebensold ("Lebensold"), #942 ("Made in U.S.A. of imported materials" might be okay).

[33] AGs, #462; AFL–CIO/ULSTD, #608; UAW, #615; Durand, #471; Vaughan & Bushnell, #616; American Hand Tool, #622. See also Matco, #600, American Sigma, #611; Sharpe, #630, Federal, #654; Exidyne, #731, and NTP, #699 (all submitting comments nearly identical to the American Hand Tool Coalition's comment).

[34] For example, UAW pointed out that "[t]he difference in rates of worker compensation between the U.S. and countries such as China allows for the possibility that 75 percent of the manufacturing costs could be U.S. value, but that the product would be 'substantially' made abroad." UAW, #615, at 2. See also Durand, #471, at 1 (stating that the percentage content safe harbor would seriously harm its business because "[c]heap labor imports of stems and bowls to be fused in the U.S. can easily be estimated to meet the 75% manufacturing cost requirement * * *"); AFL–CIO/ULSTD, #608, at 1–2 (under the 75% content safe harbor, products can be labeled "Made in USA," even though major components were produced abroad, if those components were imported from countries with lower wages); AGs, #462, at 5 (the Commission's approach of measuring foreign content by comparing the percentage of costs attributable to foreign parts and labor to those attributable to U.S. parts and labor "fails to compensate for the disparity in costs between the United States and many developing countries").

A related point was made by the American Hand Tool Coalition, which argued that varying labor costs in certain countries would lead to inconsistent labeling results for similar products, e.g., if one manufacturer sources parts from China and a second manufacturers sources the same parts from Germany, the percentage U.S. content will differ even if the manufacturers perform the same U.S. processing at the same cost, because China is a much lower cost market than Germany. American Hand Tool, #622, at 22.

[35] American Hand Tool, #622, at 16–19.

[36] See, e.g., AFL–CIO/ULSTD, #608; UAW, #615; American Hand Tool Coalition, #622; Durand, #471.

[37] AFL–CIO/ULSTD, #608, at 2 (under the second safe harbor, a product "could be assembled in the U.S. of components put together in the U.S. of parts made overseas that account for more than 25% of

the product's value"); American Hand Tool, #622, at 26; AGs, #462, at 6. See also UAW, #615, at 3 (citing Example 1 under the second safe harbor in the Proposed Guides as an example of when a product can be labeled "Made in USA" even if imported components accounted for 80% or 90% of the value of the final product); Weldbend, #597, at 1–2 (for products such as pipe fittings and flanges, the two levels of substantial transformation safe harbor would allow products with 100% foreign materials and one-half to two-thirds of their value of foreign origin to be marketed as "Made in USA").

[38] UAW, #615, at 3.

[39] American Hand Tool, #622, at 25.

[40] AGs, #462, at 1, 7. See also Sterling, #625, at 1 (supporting a 90% standard); March, #46, at 1 (supporting a 90% standard).

[41] Kodak, #619, at 2–3 (consumer perception evidence justifies lowering the U.S. content requirement to 85%; this standard, along with last
Continued

to this commenter, changing the standard might benefit consumers, because American companies would be motivated "to offer the best quality at the best price without sacrificing the 'American' identity of their goods."

## C. Comments Supporting The Proposed Guides and/or Other Standards

A few individual consumers and 62 additional commenters favored modifying the "all or virtually all" standard, including 10 members of Congress,[42] 32 manufacturers and other corporations,[43] 17 trade associations,[44] 1

nonprofit organization,[45] and 1 other commenter.[46] Many of these commenters asserted that the vast changes in the international economy since the Commission first applied the "all or virtually all" standard necessitate that the standard be altered. Thus, several commenters asserted that the Proposed Guides "better reflect[ed] the practical realities of U.S.-manufactured products in today's global economy"[47] and provided U.S. manufacturers with greater flexibility in making "Made in USA" claims in light of these realities.[48] Several of these commenters stated that consumers' expectations have kept pace with the change in the economy. According to these commenters, a lower standard is therefore consistent with consumer perception.[49]

A number of commenters disputed the claim by supporters of the all or virtually all standard that lowering the standard would lead to fewer jobs in the United States, arguing that, on the contrary, the strictness of the "all or virtually all" standard deprives American manufacturers of a selling tool that could help preserve American jobs.[50] These commenters contended that American manufacturers are at a competitive disadvantage compared to manufacturers in countries where labor rates and other production costs fall

below U.S. standards.[51] Although being able to promote their products as "Made in USA" would help to even out this disadvantage, they argued, many manufacturers' products cannot meet the current standard, either because of cost reasons or because some materials and components are no longer available from domestic sources.[52] According to these commenters, if domestic manufacturers cannot claim that their products are "Made in USA," American jobs would be jeopardized, because these companies would have little incentive to stay in the United States.[53] For example, New Balance Athletic Shoes, Inc. stated:

New Balance agrees with the sentiment, expressed in many of the public comments filed to date, that the FTC ought to take action to preserve the "Made in USA" label, support U.S. jobs, and encourage manufacturers to maintain their manufacturing facilities in this country, as well as help to level the playing field for domestic manufacturers. The "patriotic" response, however, is not to enforce an "all, or virtually all" standard that is unreachable for the vast majority of U.S. manufacturers, but to articulate a standard that those manufacturers—the companies who are providing jobs for U.S. workers—can meet so that they can compete more fairly with imports that have tremendous advantages.[54]

Other commenters asserted that, because the proposed standard would make the "Made in USA" claim more attainable, manufacturers would be encouraged to strive to maintain or increase domestic content in their products in order to make the "Made in

---

substantial transformation in the United States, would serve consumers' interests).

[42] U.S. Rep. Susan M. Collins, U.S. Rep. John F. Kerry, U.S. Rep. Joseph I. Lieberman, and U.S. Rep. Olympia J. Snowe ("Collins/Kerry/Leiberman/ Snowe"), #606; U.S. Rep. Joseph Moakley, U.S. Rep. William Delahunt; U.S. Rep. Martin Meehan; U.S. Rep. Joseph Kennedy, U.S. Rep. Barney Frank ("Moakley/Delahunt/Meehan/Kennedy/Frank"), #671; U.S. Rep. Michael G. Oxley ("Oxley"), #955. The comment from Rep. Moakley *et al.* was also signed by U.S. Rep. John Olver. In a subsequent letter, however, Rep. Olver stated that his signature was "inadvertently attached" to this comment and that he did not believe that the FTC's traditional standard for "Made in USA" labels should be altered. Olver, #671A.

[43] Franzus Co., Inc. ("Franzus"), #301; Converse, Inc. ("Converse"), #363, #470; Genfoot America, Inc. ("Genfoot"), #463; DeBon Leather ("DeBon"), #472; Carter Footwear, Inc. ("Carter"), #595; The Leather Specialty Co. ("Leather Specialty"), #598; Detroit Edge Tool Co. ("Detroit Edge"), #601; Belair Time Corp. ("Belair"), #602; Maytag Corp. ("Maytag"), #605; Oneida Ltd. ("Onedia"), #607; Jules Jurgensen Watches ("Jurgensen"), #609; Toyota Motor Sales, USA ("Toyota"), #610; Timex Corp. ("Timex"), #612; Wolverine Worldwide, Inc. ("Wolverine"), Inc., #621; Jameslee Corp. ("Jameslee"), #627; Central Tools, Inc., ("Central"), #629; Ronda Watch Corp. and Progress Watch Corp. ("Ronda/Progress"), #632; Benrus Watch Co. ("Benrus"), #633; New Balance Athletic Shoe Co., Inc. ("New Balance"), #635; The Stanley Works ("Stanley"), #647; The Timken ("Timken"), #648; The Gates Corp. ("Gates"), #649; Allegiance Healthcare Int'l, Inc. ("Allegiance"), #653; Minnesota Mining & Manufacturing ("3M"), #690; Imation Corp. ("Imation"), #643; Gary's Leather Creations ("Gary's"), #678; Sacoche Int'l, Inc. ("Sacoche"), #701; NIBCO Inc. ("NIBCO"), #738; Samsonite Corp. ("Samsonite"), #828; Whirlpool Corp. ("Whirlpool"), #957.; Hartmann Luggage & Leather Goods Group ("Hartmann"), #1013, Savannah Luggage Works ("Savannah"), #1039.

[44] Writing Instrument Manufacturers Ass'n, Inc. ("WIMA"), #187; Rubber & Plastic Footwear Manufacturers Ass'n ("RPFMA"), #264; Luggage and Leather Goods Manufacturers of America, Inc. ("LLGMA"), #464; Ass'n of Home Applicance Manufacturers ("AHAM"), #473; Int'l Mass Retail Ass'n ("IMRA"), #594; Footwear Distributors and Retailers of America ("FDRA"), #603; Int'l Electronics Manufacturers and Consumers of America ("IEMCA"), #604; Footwear Industries of America, Inc. ("FIA"), #617; National Food Processors Ass'n ("NFPA"), #620; The National Council on Int'l Trade Development ("NCITD"), #638; Joint Industry Group ("JIG"), #639; Electronics Industries Ass'n ("EIA"), #641; Japan Machinery Exporters' Ass'n ("JMEA"), #642; Committee of Domestic Steel Wire Rope and Specialty Cable Manufacturers ("Domestic Steel Wire Rope"), #644; The Specialty Cable Manufacturers Subcommittee ("Specialty Cable

Subcommittee"), #645; Ass'n of Int'l Automobile Manufacturers ("AIAM"), #650; Consumer Electronics Manufacturers Association ("CEMA"), #1041 (attaching a letter to members of Congress signed by officers of EIA, LLGMA, IMRA, FIA, the Automotive Parts and Accessories Association, and the American Association of Exporters and Importers urging the members not to cosponsor H. Con. Res. 80 and supporting the FTC's proposed guidelines as offering a "realistic approach" to "Made in USA" labeling).

[45] Made in the USA Foundation ("MUSA Foundation"), #730.

[46] JBC International (a consulting firm) ("JBC"), #637.

[47] See, e.g., Carter, #595, at 1; see also Stanley, #647; Jurgensen, #609; AIAM, #650; Wolverine, #621; AHAM, #473; AIAM, #650; JBC, #637; EIA, #641; Belair, #602; FIA, #617.

[48] See, e.g., NCITD, #638; Carter, #595; New Balance, #635; LLGMA, #464; FIA, #617.

[49] See e.g., AHAM, #473, at 2 (although consumer perception studies indicate that consumers are still interested in whether a product is "Made in USA," this "rarely signifies to the consumer that the product is 100 percent or 'all or virtually all' composed of U.S. made parts and assembled in the U.S."); Timken, #648, at 1 ("Global sourcing of components is by now so well-known that consumers recognize the fact that 'USA' merchandise may contain a small foreign content"); AIAM, #650, at 3 ("Given the fact that consumer perception data is consistent with the global marketplace, it would seem arbitrary to ignore it in fashioning Guides to prevent consumer deception.") See also Maytag, #605; FIA, #617; Converse, #363; WIMA, #187; Allegiance, #653.

[50] See, e.g., Belair, #602; AHAM, #473; Jules Jurgensen, #609; New Balance, #635.

[51] See, e.g., LLGMA #464, at 2–3 ("Foreign goods dominate the market and thousands of U.S. jobs have been lost to imports. This is because the cost structure of major foreign suppliers of luggage and leather goods is far below our own * * * Foreign suppliers in these countries utilize very cheap labor and have minimal environmental and workplace standards * * * It is crucial that the remaining luggage and leather goods manufacturers be able to market the unique 'Made in USA' label to have any hope of competing with low labor cost countries."); New Balance, #635, at 4–6 (It has become increasingly difficult to keep and expand U.S. manufacturing facilities in the face of competition from cheap imports, and the impossibility of obtaining needed components within the United States); Converse, #470; DeBon, #472; Leather Specialty, #598; Belair, #602; Jules Jurgensen. #609; Ronda/Progress, #632; Sacoche, #701.

[52] See, e.g., AHAM, #473 at 1; New Balance, #635, at 2.

[53] See, e.g., Collins/Kerry/Leiberman/Snowe, #606, at 1 ("To impose a standard which [numerous manufacturers] cannot meet is one more encouragement for businesses to abandon U.S. manufacturing for cheap overseas labor."); LLGMA, #464, at 3 ("If the FTC continues to impose unrealistic country of origin marking requirements, the decline of the U.S. luggage and leather goods industry and its migration off shore will be hastened."); Moakley/Delahunt/Meehan/Kennedy/ Frank/Olver, #671, at 2 ("If the standard is so high that it cannot be met, manufacturers will have no incentive even to try.")

[54] New Balance, #635, at 2–3.

USA'' claim.[55] Several commenters noted that the proposed standard would allow them to make unqualified ''Made in USA'' claims for their products, although they cannot make such claims under the current standard. According to Wolverine, for example: ''As currently proposed, the FTC's guides would, for the first time, afford the opportunity for hundreds of thousands of American workers to see their contributions in factories throughout the United States create products which will appropriately carry the unqualified designation as having been 'Made in America.' ''[56]

Some of the commenters favoring a change in the standard expressed their support for the safe harbors for unqualified U.S. origin claims set forth in the Proposed Guides.[57] Other commenters, however, while expressing general support for the Proposed Guides, asked the Commission to revise one or both of the proposed safe harbors and offered specific advice as to how this should be done.[58] For example, a few commenters expressly supported one proposed safe harbor, but urged the Commission to eliminate the other.[59] Several other commenters stated that, although the Commission's 75% U.S. content safe harbor is an improvement over the current ''all or virtually all'' standard, the Commission should lower the U.S. content percentage even further. The Luggage & Leather Goods Manufacturers of America, for example,

asked the Commission to lower the standard to 50%, because the luggage and leather goods industry ''has been forced to increase its reliance on foreign materials and components. As domestic industry has grown smaller, so has its supplier base. Therefore, domestic producers often have no choice but to source certain components off shore * * *.[60] In addition, a few commenters suggested alternative ways to calculate domestic content.[61]

A number of commenters argued that the Commission's proposed second safe harbor, which would have allowed an unqualified U.S. origin claim where a product undergoes two levels of substantial transformation in the United States (the product's last substantial transformation took place in the United States, and the last substantial transformation of each of its significant inputs took place in the United States), is too burdensome. Several, for example, urged the Commission to apply only one level of substantial transformation (*i.e.*, requiring that only the final substantial transformation of the product be performed in the United States) rather than two, or suggested other modifications to this safe harbor.[62]

In addition, a number of commenters urged the Commission to replace the Proposed Guides altogether with a lower standard. As was the case during the Commission's earlier public comment period on this issue, many commenters, for example, asked the Commission to replace the ''all or virtually all'' standard with a substantial transformation standard or with the NAFTA Preference Rules.[63] One commenter recommended that the Commission apply a case-by-case, reasonable basis approach to all country-of-origin claims.[64]

Finally, several commenters asked the Commission to modify the Proposed Guides to specifically address certain situations not expressly discussed in the Proposed Guides [65] or to exempt certain types of products.[66]

---

[55] See, e.g., Allegiance, #653, at 1 (the ability to capitalize on consumer preference for ''Made in USA'' products favorably influences a company's decision to continue producing in the United States); Maytag, #605; NIBCO, #738.

[56] Wolverine, #621, at 2. See also Detroit, #601; Imation, #643; Benrus, #633; Ronda/Progress, #632; NIBCO, #738.

[57] Collins/Kerry/Leiberman/Snowe, #606; Moakley/Delahunt/Meehan/Kennedy/Frank/Olver, #671 , Oxley, #955; Allegiance, #653, Belair, #602; Benrus, #633; Carter, #595; Detroit, #601; Gary's, #678; Gates, #649; Genfoot, #463; Hartman, #1013; Imation, #643; Jurgensen, #609; Maytag, #605; New Balance, #635; NIBCO, #738; Oneida, #607; Timex, #612; Timken, #648; IMRA, #594; WIMA, #187.

[58] Converse, #363, #470; DeBon, #472; Jameslee, #627; Rhonda/Progress, #632; Sacoche, #701; Samsonite, #823; Whirlpool, #957; Wolverine, #621; JBC, #637; AHAM, #473; AIAM, #650; FDRA, #603; LLGMA, #464; RPFMA, #264; IEMCA, #604; JIG, #639; NCITD, #638; EIA, #641.

[59] Some commenters objected to the percentage content safe harbor and argued that the Commission should only apply to two levels of substantial transformation safe harbor. See, e.g., JBC, #637, at 1 (percentage content rules can be ''consciously manipulated, affected by exchange rates, and otherwise made administratively impossible to enforce.''); JIG, #639; AIAM, #650. In contrast, two commenters supported the percentage content safe harbor, but not the two levels of substantial transformation safe harbor, MUSA Foundation, #730, at 2 (the two levels of substantial transformation safe harbor ''opens up a very wide loophole''); Central Tools, #629.

[60] LLGMA, #464; at 2. See also FIA, #617, at 3 (a product that contains more than 50% U.S. content clearly qualifies as ''substantially all'' made in the United States); RPFMA, #264; at 2 (70% justified by consumer perception evidence); Converse, #363, at 1 (preferring a 70% standard); Leather Specialty, #598, at 2 (supporting a 50% standard); Wolverine, #621, at 5 (supporting a majority U.S. content safe harbor or, at least no higher than 70%); AIAM, #650, at 1 (favoring substantial transformation standard or lowering U.S. content safe harbor at least to 70%); Savannah, #1039 (supporting a 50% standard). Cf. DeBon, #472, at 1, Jameslee, #627, at 1, and Sacoche, #701, at 1 (all three asserting that the 75% standard would be relatively difficult for many U.S. manufacturers to meet, but not recommending a specific percentage).

[61] See, e.g., LLGMA #464, at 3–4 (the NAFTA regional content net cost formula should be used to calculate domestic content); Stanley, #647, at 6–9 (the Commission should not adopt ''arbitrary'' percentage for U.S. content, but if it does, it should make clear that the percentage of total manufacturing costs relates to cost of fabrication only); Dynacraft, #646, at 7–8 (opposes lowering the standard, but if the Commission adopts the Proposed Guides, the Commission should base the percentage content standard on actual manufacturing costs); EIA, #641, at 2 (the percentage cost safe harbor should only look one step back in the manufacturing process); AHAM, #473, at 2 (the Commission should provide the option of using Generally Accepted Accounting Principles of cost accounting as an alternative method for calculating percentage content).

[62] See, e.g., NCITD, #638, at 2 (favoring the use of the NAFTA marking rules for single substantial transformation as the second safe harbor, rather than requiring two levels of substantial transformation); Stanley, #647, at 9–11 (favoring only one level of substantial transformation for products involving processes other than assembly); 3M, #700, at 1–2 (arguing that two levels of substantial transformation creates too great an administrative cost for U.S. corporations); EIA,

[63a] #641, at 7 (this safe harbor may be unduly restrictive, depending upon the meaning of term ''significant;'' Commission should modify the concept of ''all significant components'' with a requirement that the final components transformed in the United States constitute most of the total component value). *But see* Timex, #612, at 4 (the Commission may want to consider adding a cost threshold, such as 51% U.S. costs, to the two levels of substantial transformation safe harbor, to guard against consumer deception).

[63] See, e.g., AHAM, #473 (NAFTA Preference Rules); IEMCA, #604 (substantial transformation); Maytag, #605 (NAFTA Preference Rules); NFPA, #620 (substantial transformation); Ronda/Progress, #632 (substantial transformation); Domestic Steel Wire Rope, #644 (substantial transformation); Speciality Cable Subcommittee, #645 (substantial transformation); National Electrical Manufacturers Ass'n (''NEA''), #702 (substantial transformation); NFPA, #620, at 2 (substantial transformation); JMEA, #662, at 2–3 (standards of the World Trade Organization and U.S. Customs); *see also* JIG, #639 and NCITD, #638 (supporting the Proposed Guides, but preferring a substantial transformation standard); NEMA, #702 (urging substantial transformation standard for industrial products).

[64] Toyota, #610.

[65] For example, one commenter requested that the Commission amend the Guides to specifically permit manufacturers rebuilding or remanufacturing automotive parts in the United States to designate their products ''Made in USA'' if the products originally were used in the United States, regardless of where the products originally were manufactured. Automotive Parts Rebuilders Ass'n (''APRA''), #698, at 1–3. *See also* NFPA, #620, at 2 (if Proposed Guides apply to processed foods, Proposed Guides should include references to raw agricultural products and processed or manufactured food products in cost and other definitions and include processed food product examples); Wolverine, #621, at 6–8 (Commission should authorize ''Made in USA'' claims for products assembled or processed in accordance with subheading 9802.00.8040, HTSUS); Carter, #595, at 1–2 (asking the Commission to explain how it will treat certain qualified claims under the Proposed Guides, *e.g.*, when a qualified claim indicates that some or all of the parts are of U.S. origin, do those parts have to meet the standard for an unqualified ''Made in USA'' claim?).

[66] Two commenters asked the Commission to apply the Proposed Guides only to consumer goods, not to industrial products, arguing that industrial products are produced to the specifications (including country of origin) of a sophisticated

Continued

*D. Commenters' Discussion of Other Issues*

Several commenters discussed additional issues raised in the **Federal Register** notice soliciting comments on the Proposed Guides. These issues included whether the Commission should treat unqualified "Assembled in USA" claims the same as unqualified "Made in USA" claims, whether the Commission should recognize a separate "Origin: USA" claim in limited instances for domestically-sold products that also are exported for sale, and whether the Commission should eliminate its traditional presumption that products that do not bear any country-of-origin marking are understood by consumers to be made in the United States. These comments are discussed below.

1. "Assembled in USA" Claims

In the **Federal Register** notice announcing the Proposed Guides, the Commission solicited comment on whether a product that does not meet the standard for unqualified U.S. origin claims should nonetheless be permitted to be labeled or advertised as "Assembled in USA" without further qualification; and if so, under what circumstances, i.e., what processing should it undergo in the United States to support the unqualified claim. Five commenters contended that the claim should be interpreted similarly to an unqualified "Made in USA" claim, and must therefore be qualified (e.g., "Assembled in USA from imported parts") if it does not meet the standard for unqualified "Made in USA" claims. According to these commenters, consumers understand "Assembled in USA" to mean the same thing as "Made in USA."[67] Two commenters, on the other hand, contended that consumers perceive the two claims differently. The coalition of state Attorneys General, for example, suggested that "while the term 'make' connotes a process of creation the term 'assemble' is generally understood to mean the final process of fitting or joining together pre-existing

parts."[68] These commenters favored permitting an unqualified "Assembled in USA" claim where a "Made in USA" claim would be inappropriate.[69]

In addition, three of these commenters addressed the circumstances under which they believed an "Assembled in USA" claim should be permitted. Two commenters favored authorizing the use of unqualified "Assembled in USA" claims for products that have been last substantially transformed in the United States.[70] Another commenter supported requiring at least 50% U.S. content to ensure more than minimal or simple assembly operations; even at that level, however, the commenter recommended requiring that the claim be qualified to disclose whether foreign components were used.[71]

2. "Origin: USA" Claims

In the Proposed Guides, the Commission proposed allowing marketers to use a "lesser mark"—"Origin: USA"—in certain, limited circumstances. Such a mark would have allowed manufacturers to uniformly label products for sale in both the United States and abroad, when a foreign country may require that a product exported from the United States be marked with an indication of U.S. origin, while that same product would not be permitted to bear an unqualified U.S. origin claim when sold in the United States. Use of the lesser mark would have been subject to certain restrictions, including that consumer products sold in the United States would have to include, in some manner, an additional disclosure of the existence of any substantial foreign content. The commenters addressing this issue were evenly divided as to whether marketers should be allowed to use a "lesser mark" or specific claim such as "Origin: USA."[72]

A number of commenters supporting the option of using an "Origin: USA" label argued that such a claim would benefit manufacturers who export U.S. products, as well as consumers, for example, by eliminating the need to separately label domestic and exported products and to maintain packaging plants in foreign countries for the sole purpose of meeting conflicting country-of-origin labeling standards;[73] by encouraging U.S. manufacturers to manufacture and sell more U.S. products if they can export the products for sale in foreign markets without the added costs associated with the Commission's historic restrictions on U.S. origin statements;[74] and by reducing the price of consumer goods sold in the United States, because of the cost savings to U.S. manufacturers.[75] At least one commenter who supported the use of the lesser mark asserted that additional disclosure requirements for consumer goods sold in the United States would not be necessary to prevent consumer deception.[76] Another commenter suggested alternative lesser marks to avoid the burden and expense of additional labeling for U.S. sales while providing additional information to U.S. consumers.[77]

On the other hand, other commenters argued that whatever benefits an "Origin: USA" mark would provide would not justify the potential confusion caused by the lesser mark, as consumers were likely to confuse "Origin: USA" labels with "Made in USA" labels.[78] Even the additional disclosures required on consumer goods sold in the United States, some of these commenters stated, would not be sufficient to prevent consumer deception or might even increase

---

customer. JIG, #639; NEMA, #702. *But see* Kern, #739, at 2 (the "'creative' use of the 'Made in the USA' designation has caused considerable confusion in my [tool] company's local and national marketplace of normally well informed industrial customers and has had a negative financial impact on my company and its employees").

[67] *See* Gates, #649, at 2–3 ("Assembled in USA" claim should identify country of origin of major component parts); Timken, #648, at 3–4 (because of similarity between "Made" and "Assembled" and the importance of assembly to respondents in Commission's survey, unqualified "Assembled in USA" mark is inappropriate); IMRA, #594; FDRA, #603; Timex, #612.

[68] ACs, #462, at 5.

[69] Id., #462, at 4–5 (treating terms differently would allow manufacturers to market their products effectively, using easily understood unqualified claims that would not sacrifice truth in advertising); AIAM, #650, at 1–2, 5–6. *See also* Toyota, #610, at 6–7 (if Commission concludes that a bright line test is necessary for "Made in USA" claims, it should allow "assembled in" or "built in" claims based only on substantial transformation).

[70] ACs, #462, at 6; Toyota, #610, at 6–7.

[71] Gates, #649, at 2–3.

[72] Seven commenters supported use of a "lesser mark." LLGMA, #464, at 4; IMRA, #594, at 4–5 (strongly supports as a short-term solution until WTO adopts origin-marking requirements; the Commission should prohibit use of the "Origin: USA" claim in advertising, because the issue faced by exporters is purely a labeling issue, and could be abused in advertising); FIA, #617, at 8–9; Wolverine, #621, at 8; JBC, #637, at 3–4; JIG, #639, at 4; NEMA, #702, at 1–3. Seven commenters opposed the use of such a mark. FDRA, #603, at 2–

[73] JBC, #637, at 3–4; JIG, #639, at 4 (cost of maintaining separate packaging facilities in foreign markets for sole purpose of complying with conflicting country-of-origin markings and Commission's "all or virtually all" standard for U.S. origin claims adds 10% to 30% per product; cost of special labels and/or relabeling U.S. product in United States for export adds 10% to 15% per product); NEMA, #702, at 2–3.

[74] Timex, #612, at 1, 5–6; NFPA, #620, at 3–4; American Hand Tool, #622, at 29–31; Timken, #648, at 4–5; Gates, #649, at 3–4; Wright, #662, at 2.

[75] JIG, #639, at 4.

[76] Id., #639, at 6.

[77] JBC, #637, at 3–4.

[78] FIA, #617, at 8–9 (suggesting lesser mark "Origin: USA (for export)" to allow manufacturers to avoid burden and expense of additional labeling while alerting consumers that the article is labeled for export; alternatively, lesser mark "Origin: USA (with non-U.S. content)" to provide U.S. consumers with relevant information while eliminating additional labeling requirements).

[78] *See, e.g.,* Timken, #648; American Hand Tool, #622; Gates, #649; Timex, #612.

consumer confusion.[79] Some commenters also asserted that a lesser mark is unnecessary,[80] arguing that if a foreign country's marking rules require the origin of a product to be "USA," then the manufacturer can identify the United States as the assembly point and further qualify the origin, e.g., "Assembled in USA from Components of U.S. and Foreign Origin," or apply separate labels or marks, depending upon the destination of the goods.[81] In addition, one commenter who supported a substantial transformation standard for unqualified "Made in USA" claims found the alternative of using an "Origin: USA" claim to be inadequate. This commenter contended that the lesser mark would provide little or no benefit because the additional disclosure requirements for U.S. sales of consumer products would create a dual marking requirement.[82] Last, even some commenters supporting use of a lesser mark were unsure whether the lesser mark "Origin: USA" would be an acceptable marking to foreign customs officials.[83]

## 3. Rebuttable Presumption for Unmarked Products

As explained in the prior **Federal Register** notice, the Commission has historically employed a rebuttable presumption that goods not labeled with any country of origin are understood by consumers to be made in the United States. As a result, the Commission required that foreign origin be disclosed if unmarked goods contained a significant amount of foreign content. Based on the facts that manufacturing and the sourcing of components have become increasingly global in nature and that consumers appear to be increasingly aware that goods they buy are produced throughout the world, the Commission announced in the **Federal Register** notice that it no longer was appropriate to presume that reasonable consumers will interpret the absence of a foreign country-of-origin mark, by itself, as a representation that the product was made in the United States. The Commission, therefore, determined to cease using this presumption, but instead explained that it would require disclosure of foreign origin on unmarked goods only if there is some evidence that, with respect to the particular type of product at issue, a significant minority of consumers views country of origin as material and believes that the goods in question, when unlabeled, are domestic.[84]

Although the Commission did not specifically solicit comments on this determination,[85] four commenters submitted their views concerning the current need for the presumption. Three commenters urged the Commission not to eliminate the presumption, arguing, among other reasons, that it was appropriate for the producer of an unmarked product to have the burden of proving that the lack of a country-of-origin indication was not deceptive.[86] The other commenter agreed with the

Commission that the presumption should be eliminated, and, indeed, urged the Commission to go further and clearly indicate that an unmarked product, in and of itself, would not be considered deceptive simply for the fact of being unmarked.[87]

## III. Analysis

Section 5 of the Federal Trade Commission Act, 15 U.S.C. 45, proscribes "unfair or deceptive acts or practices" in or affecting commerce. An advertisement, label or other promotional material will be found to be deceptive if it contains a representation or omission that is likely to mislead consumers acting reasonably and that representation or omission is material. In applying the principles of Section 5 and the Commission's traditional deception analysis to U.S. origin claims, the Commission has, throughout its review, focused first and foremost on consumers' understanding of such claims.[88]

The considerable evidence available to the Commission concerning consumer understanding of "Made in USA" claims was discussed at length in the Commission's May 7, 1997 **Federal Register** notice. As explained in that notice, the Commission itself, as part of its overall review of U.S. origin claims, commissioned a two-part study in 1995 (referred to as the "1995 Copy Test" and "1995 Attitude Survey," respectively) to look at consumer perception of such claims.[89] In addition, the Commission had previously conducted a more limited study of these issues in 1991 as part of a subsequently closed investigation ("1991 Copy Test").[90] The results of these studies indicated that many consumers expected that a product advertised or labeled as "Made in USA" had a high amount of U.S. content, but that a significant number of these were willing to accept a product with at least some foreign content and that, as a result, there was a range of values at which most consumers would find a "Made in USA" claim appropriate. In addition, the studies suggested that many consumers appeared to have only a general sense of what "Made in USA" means and did not necessarily have in mind a highly

[79] FDRA, #603, at 2–3 ("Origin: USA" label likely would prove deceptive even if appropriate qualifying language appears on a hangtag or packaging because commenters would not locate or read the qualifying language); Timex, #612, at 5 (consumer likely would decide to purchase a watch without seeing package containing additional disclosures because watches are frequently displayed without packaging, and packaging products are pulled from a cabinet or shelf once the consumer has made purchasing decision); American Hand Tool, #622, at 29 (strongly opposed the "Origin: USA" label); Gates, #649, at 4 (the meaning of a lesser mark, even where qualified by the phrase "substantial foreign content," would be uncertain to consumers).

[80] Wright, #262, at 2 (marking is the last or near to last operation performed; it is practical to run large lots and carry most inventory in an unmarked condition, involving only a relatively small cost penalty); American Hand Tool, #622, at 29–31 (little need for lesser mark; Commission found little evidence that companies routinely face conflicting labeling requirements or that "Made in USA" claim causes such conflicts); Gates, #649.

[81] Gates, #649, at 3–4. See also Timex, #612, at 5 (a qualified marking such as "Assembled in USA; Philippines movement" for watches would satisfy the marking requirements of almost every other country—most of which identify the place of origin of a watch as the place of final assembly; this qualified marking would therefore resolve—for watches—the concerns that prompted the Commission to consider an "Origin: USA" marking).

[82] NFPA, #620, at 4 (economic burden of sticker labeling or hangtags similar to creation of additional labeling inventory, and handling requirements might be even more burdensome).

[83] See, e.g., NEMA, #702, at 2 (a number of countries have indicated either that they would not accept an "Origin: USA" mark or that they are not sure); JIG, #639, at 5 ("Origin: USA" likely would not be acceptable to customs officials in at least Australia, New Zealand, and Canada).

[84] 62 FR at 25047.

[85] The Commission's determination on this point was not part of the Proposed Guides, but was included in the **Federal Register** notice accompanying the Guides because it addressed a related topic that had been raised at the public workshop.

[86] Timken, #648, at 5–6; Gates, #649, at 4 (also asserting that the presumption is a valuable remedy to counter the incentive for foreign producers to import unmarked products, e.g., the producers of automotive belts, who may have the incentive to import unmarked belts contrary to antidumping duty orders and U.S. Customs marking regulations). See also Oneida, #607, at 1–2 (arguing that the presumption is particular necessary in catalog sales where the consumer cannot inspect the item prior to purchase, and expressing its concern that without the presumption, attempting to show that a significant minority of consumers believes an unmarked product is domestic would be unworkable).

[87] IMRA, #594, at 5–6.

[88] To the extent they are not inconsistent with consumer understanding, other considerations, such as the compliance burdens placed on businesses, have been considered by the Commission as part of its general obligation to act in the public interest.

[89] This study is available as Document No. B212883 on the Commission's public record.

[90] Document No. B213001 on the Commission's public record.

detailed conception of what it meant for a product to be "Made in USA."

In the 1995 Attitude Survey, participants were presented with a series of scenarios and asked whether they agreed or disagreed with a "Made in USA" label on a product in those circumstances. In the scenarios, the percentage of the product's cost that was U.S. in origin varied from 10% to 90%; in addition, participants were either told that the product was assembled in the United States, told that it was assembled abroad, or not told the site of assembly. The Attitude Survey indicated that a "Made in USA" label would likely be misleading to most consumers when a product contained 50% or less U.S. content or was assembled abroad. However, where a product was assembled in the United States, a significant majority of consumers agreed that a "Made in USA" claim would be appropriate if the product contained either 70% U.S. content (67% of respondents) or 90% U.S. content (75% of respondents), suggesting that there is a range of standards likely to be considered acceptable and nonmisleading by most consumers.

As in the 1995 Attitude Survey, in the 1991 Copy Test, the Commission had also found evidence that many consumers expected a product called "Made in USA" to have a high amount of U.S. content. In that study, of the participants who were asked "when you see the phrase 'Made in USA' on a product or in an ad, how much of the product was made in the United States?" approximately 77% said that all or almost all of the product so labeled was made in the United States. Nonetheless, the answers to a follow-up question attenuated this result somewhat. When asked whether they meant parts or labor or both parts and labor, only 77% of the respondents (82% of those who answered "all or almost all") said both parts and labor, while 14% said labor only, and 9% said only parts.[91]

The 1995 Copy Test attempted to explore further issues of what consumers included in their definitions of Made in USA, but the results were less than definitive. For example, in the 1995 FTC Copy Test, when respondents were shown a "Made in USA" claim and asked an open-ended question

about what the claim meant, 63.5% said simply that the claim meant "Made in USA."[92] Moreover, when asked specifically whether the claim suggested or implied anything about where the product was assembled, only 49% said that it did (almost all of whom said it meant the product was assembled in the United States); only 28% of those asked about an unqualified "Made in USA" claim said it suggested or implied anything about where the parts were made; and only 11% said it implied anything about how much of the parts were made in the United States. Indeed, a total of 34% of respondents stated that a "Made in USA" claim did not suggest or imply anything about any of these factors—assembly, parts, or how much of the total cost of the product was incurred in the United States. This suggests that many consumers may not have in mind a highly developed definition of "Made in USA"; in any event, the data are not definitive. In addition, the available consumer perception evidence suggests that, to the extent that consumers do define Made in USA, they may do so in a variety of different ways. For example, in each of the Commission-sponsored surveys, there is evidence, albeit inconclusive, of a minority of consumers who, rather than expecting a high amount of both U.S. parts and labor, view "Made in USA" claims as referring only to where a product was put together. Thus, 28.5% of respondents to the 1995 Copy Test answered that "Made in USA" implied that a product was assembled in the United States but that it did not imply that a product's parts were necessarily U.S. made; 20% of respondents in the 1995 Attitude Survey agreed that a "Made in USA" label would be appropriate for a product that was assembled in the United States but whose costs were only 10% U.S.; and 14% of those asked in the 1991 copy test indicated that "Made in USA" referred only to labor, not parts.

The Commission has thus been presented with evidence that suggests that many consumers expect that "Made

in USA" labels connote a high amount of U.S. content, as well as that many of these consumers do not have a detailed conception of what it means for a product to be "Made in USA." Moreover, the evidence suggests that no single standard is likely to correspond to the views of all consumers, and that there is a range of points along the spectrum that would likely satisfy a significant majority of consumers. Based on this evidence, the Commission initially proposed a "substantially all" standard. Although this was not the only possible standard consistent with the data, it was, the Commission believed, a high threshold for "Made in USA" claims that would at the same time provide some flexibility to U.S. manufacturers operating in an increasingly global economy. Moreover, although nominally less stringent than the existing standard, the proposed "substantially all" standard and the associated guides provided strict constraints with respect to the sort of details that the consumer perception studies were unable to address but that can have a great deal of practical effect in determining whether a product can meet the standard for "Made in USA" claims (however that standard is denominated)—e.g., how far back in the manufacturing process marketers were required to look, or what sorts of costs should be included in the calculation of U.S. content.

Nonetheless, the record currently before the Commission does not support adoption of the "substantially all" standard and the accompanying guides proposed in May. The vast majority of those commenting, including, significantly, a large number of individual consumers as well as a number of U.S. manufacturers, opposed the proposed standard, perceiving it, contrary to the Commission's intent, as significantly weakening the standard for "Made in USA" claims. The submissions of these commenters suggest that the Commission may have underestimated the benefits such individuals or corporations derive from the current standard and the costs they believe they will incur if the standard is changed. An overwhelming number of consumers told the Commission, through written comments, telephone calls, and petitions, that they prefer buying U.S.-made goods; they want to be able to rely on a simple and clear standard; and, they feel very strongly that the current standard should be retained. The comments also underscore the fact, noted as well in the Commission's May **Federal Register** notice, that consumer awareness of the

---

[91] There was no attempt in this survey to breakdown these categories further—i.e., to look at whether the respondents who said that "Made in USA" referred to parts also thought that it referred to the materials that went into those parts; or whether those who said "Made in USA" referred to labor meant only final assembly labor or also any labor that went into making the parts.

[92] During the Commission's earlier comment period on this matter, a number of commenters suggested that the fact that many consumers said that "Made in USA" means "Made in USA" showed that consumers understood "Made in USA" claims as referring only to where a product "came into being," i.e., where it underwent its final assembly or processing. See 62 FR at 25037. By contrast, in response to the Commission's May notice, some commenters suggested that the response that "Made in USA" means "Made in USA" showed that consumers expected a product labeled "Made in USA" to be 100% "Made in USA." The Commission continues to believe, however, that there is inadequate evidence upon which to infer either meaning from this tautological definition.

Federal Register / Vol. 62, No. 231 / Tuesday, December 2, 1997 / Notices    **63765**

globalization of the economy has not necessarily changed consumers' beliefs about those products actually labeled "Made in USA." Thus, the Commission concludes that the better course, and one equally consistent with the consumer perception evidence, is to retain and continue to enforce the Commission's traditional all or virtually all standard.

## IV. Enforcement Policy Statement

The "all or virtually all" standard—and its earlier equivalent, the "wholly domestic" standard—was developed through case law and advisory opinions that were largely limited to discussions of single products, and the standard has never been more generally defined. Indeed, throughout this review process, commenters, particularly those businesses that must comply with the requirements for "Made in USA" claims, have entreated the Commission to provide more guidance on what this standard (or any other standard the Commission were to adopt) requires. For that reason, the Commission in retaining the "all or virtually all" standard, is at the same time issuing an Enforcement Policy Statement on U.S. Origin Claims. The Enforcement Policy Statement sets forth the general principles to which the Commission will adhere in enforcing the requirement that goods promoted as "Made in USA" must be all or virtually all made in the United States. The Enforcement Policy Statement is intended to give general guidance on making and substantiating U.S. origin claims. It is not designed, however, to answer all questions that may arise on this topic. Given the complex and varied factual scenarios that present themselves in this area, and the wide range of products for which U.S. origin claims may be made, there are necessarily issues that will continue to be more appropriately resolved on a case-by-case basis.

The Enforcement Policy Statement addresses a range of basic issues related to U.S. origin claims. It includes introductory information on the scope of the products and claims to which the Statement applies and of the respective responsibilities of the FTC and the U.S. Customs Service in regulating country-of-origin claims; an explanation of the Commission's authority to act against deceptive practices and how the Commission is likely to interpret express and implied U.S. origin claims; a discussion of unqualified U.S. origin claims and the factors that the Commission will consider in determining whether such a claim is substantiated, i.e., whether a product is "all or virtually all" made in the United

States; and guidance on using qualified claims where a product does not meet the "all or virtually all" standard. The Enforcement Policy Statement is intended to be self-explanatory; nonetheless, a few matters that may be of particular interest are highlighted below.

*Substantiating U.S. Origin Claims: The All or Virtually All Standard.* The Enforcement Policy Statement sets forth the requirement that where a product is labeled or advertised as "Made in USA," the marketer should possess and rely upon a reasonable basis that the product is all, or virtually all, made in the United States. A product that is "all or virtually all" made in the United States is described typically as one in which all significant parts and processing that go into the product are of U.S. origin, i.e., where there is only a de minimis, or negligible, amount of foreign content. In order to provide further guidance, the Enforcement Policy Statement discusses three factors that the Commission will likely consider in evaluating whether a product is all or virtually all made in the United States: whether the final assembly or processing of the product took place in the United States; the portion of the total manufacturing cost of the product that is attributable to U.S. parts and processing; and how far removed from the finished product any foreign content is.

There was widespread agreement among commenters who addressed the issue (both in response to the May 7, 1997 **Federal Register** notice and to the Commission's earlier requests for public comment), whatever standard they otherwise supported, that a product should have to undergo its final processing in the United States in order to be called "Made in USA." This view is confirmed by the consumer perception evidence, which indicates that the country of final assembly is highly significant to consumers in evaluating where a product is "made." Accordingly, the Enforcement Policy Statement indicates that a product promoted as "Made in USA" must have undergone its final assembly or processing in the United States; in particular, the product must, at minimum, have been last substantially transformed in the United States (this also ensures that no product required to be labeled with a foreign country-of-origin under the Customs Service's rules would be permitted to make a "Made in USA" claim).

The Enforcement Policy Statement also indicates that, in determining whether a product is appropriately represented to be "Made in USA," the

Commission will consider what portion of the total cost of manufacturing the product is attributable to U.S. parts and processing. Obviously, the greater the percentage of U.S. costs, the more likely the product will be considered all or virtually all made in the United States. As discussed above, there were a great many commenters who criticized the 75% safe harbor put forth as part of the Commission's earlier proposal as overly lax and likely to deceive many consumers, and the Commission agrees that the record as a whole does not support adoption of such a safe harbor. The Commission, however, believes that, as a matter of enforcement policy, it is appropriate to allow for some small but reasonable amount of tolerance in enforcing the "all or virtually all" standard. Some commenters have called for the Commission to define this tolerance level with a bright line percentage standard so as to provide greater certainty to marketers. Nonetheless, the Commission has concluded that any such certainty is likely to be illusory and no single percentage standard will be appropriate for all products in all circumstances.[93] Instead, the Commission will look at U.S. manufacturing costs in the context of the other factors outlined here and in light of the nature of the product and consumers' expectations. In general, the Commission concludes that it will not be in the public interest to bring a law enforcement action where the proportion of U.S. costs of the product is extremely high.

Finally, the Enforcement Policy Statement indicates that, in evaluating whether any foreign content is significant enough to prevent a product from being considered all or virtually all made in the United States, the Commission will also examine how far removed the foreign content is from the finished product. In other words, foreign parts or materials that are incorporated several steps back in the manufacturing process are generally less

---

[93] For example, in some cases, the percentage of manufacturing costs attributable to foreign parts and process may not reflect the true extent of foreign content. Where only a small amount of domestic processing takes place and the bulk of the work on the product is performed abroad, or a significant component is manufactured abroad, it may be possible that, because of lower costs for foreign parts and labor, foreign costs may be disproportionately low relative to the amount of foreign production. Similarly, as the American Hand Tool Coalition noted, a product made with inputs from a high-cost country (such as Germany) will reflect a higher degree of foreign content (in terms of cost) than would a product made with identical inputs supplied from a low-cost country (such as China). In such circumstances, it may be preferable to look more generally at the significance of the foreign inputs rather than evaluate their extent entirely in terms of cost.

likely to be significant than are parts or materials that are immediate inputs into the final product.

Many commenters implicitly recognized this point. The Attorneys General, for example, suggested that raw materials be excluded from the calculation of foreign content, suggesting that "a company that designs and manufactures a plastic product entirely within the U.S.A. but uses petroleum from a foreign county, could fairly claim that the product was made in the U.S.A. with no foreign component parts." [94] Some other supporters of the "all or virtually all" standard, even those who supported including all basic materials in the analysis, also appeared to acknowledge that there should be limits as to how far back a manufacturer must go in accounting for foreign materials. For example, a number of commenters, arguing that steel must be included in the evaluation of a product's origin, did not also suggest that a manufacturer should be required to go as far back as the iron ore used in the steel. [95] On the other hand, commenters also recognized that raw materials can sometimes be relevant to the determination as to whether a product is all or virtually all made in the United States, especially when the raw materials are only one step back from the finished product and are integral components of that article. For example, the Tile Council of America, arguing that the Commission must include raw materials in the evaluation of whether a product is made in the United States, stated that "the quality and reliability benefits of tile 'Made in the USA' are the result of both the domestic sourcing of raw materials and the domestic manufacturing process. Tile manufactured in the United States of clay dug in Mexico * * * clearly [does] not meet the 'Made in USA' expectations of U.S. consumers." [96]

Thus, the Enforcement Policy Statement indicates that raw materials, per se, will be neither automatically included nor excluded from the Commission's evaluation of whether a product is all or virtually all made in the United States. Instead, here, too, the Commission's analysis will depend on the percentage of the cost of the product the raw materials constitute and how far removed from the finished product the raw materials are, and, because some raw materials are naturally nonoccurring in this country, whether

the raw material is indigenous (and available in commercial quantities) in the United States.

*Qualified U.S. Origin Claims and "Assembled in USA".* Few commenters directly addressed the use of qualified U.S. origin claims, although those that did commented favorably, suggesting that qualified claims can provide valuable information to consumers. [97] The Commission has always permitted marketers to use appropriately qualified claims where their products would not meet the standard for an unqualified "Made in USA" claim, and that continues to be the case. The Enforcement Policy Statement addresses various types of qualified claims, including claims about the U.S. origin of specific processes or parts and comparative U.S. origin claims, and indicates that all such claims must be truthful and substantiated and that qualifications and disclosures should be clear, prominent and understandable. Comparative U.S. origin claims may be a particularly useful vehicle for those manufacturers who wish to draw a distinction between the domestic content of their products and those of competitors who engage in less domestic manufacturing or use fewer U.S. made parts.

As discussed above, the Commission specifically solicited comment in its May 7, 1997 *Federal Register* notice on one particular alternative claim, "Assembled in USA." The Commission asked for comment on whether a product that does not meet the standard for an unqualified U.S. origin claims should nonetheless be permitted to be promoted as "Assembled in USA," and, if so, under what circumstances. Upon review of the responses and further reflection, the Commission has concluded that "assembled" has a common meaning sufficiently distinct from "made" so that in many instances it will be appropriate for marketers to promote a product as "Assembled in USA" without further qualification. [98] Specifically, the Enforcement Policy Statement states that such a claim may be used where a product has undergone its principal assembly in the United States and that assembly is substantial; it also indicates that a product should have been last substantially transformed in the United States if it is to be labeled or advertised as "Assembled in USA."

## V. Issues Not Addressed by the Enforcement Policy Statement

### A. Origin: USA

As explained above, in the Proposed Guides, the Commission sought comment on the use of a separate "lesser mark" for products that faced conflicting marking requirements when sold domestically and exported. Several commenters praised the proposal as likely to save U.S. businesses, and consumers, money while others contended that such a mark was unnecessary and likely to confuse consumers. Upon reviewing the record, the Commission finds that, at the present time, there is inadequate evidence of the extent of both the problems purportedly caused by conflicting labeling requirements (*e.g.,* to what extent conflicting marking requirements actually occur, how frequently multiple labeling is actually required) as well as of the degree to which a lesser mark such as "Origin: USA" is likely to alleviate these problems (*e.g.,* whether relabeling would have been required in any event because of language differences, whether foreign customs services will accept this mark). As a result, the Commission has concluded that the benefits to be gained through establishment of this mark are as yet too speculative to outweigh the more obvious costs in potential confusion between such a mark and "Made in USA." Accordingly, the Commission has not adopted "Origin: USA" (or any other lesser mark) in the Enforcement Policy Statement.

### B. Goods With No Country-of-Origin Marking

In the May 7, 1997 *Federal Register*, the Commission indicated that it would no longer employ its historical rebuttal presumption that unmarked goods will be understood by reasonable consumers to have been made in the United States, but instead would look at an array of factors on a case-by-case basis. Although a few commenters disagreed with this change in policy, the Commission continues to believe that this course is appropriate and more in keeping with the Commission's traditional deception analysis that is widely applied to other representations and omissions.

## ENFORCEMENT POLICY STATEMENT ON U.S. ORIGIN CLAIMS

### I. Introduction

The Federal Trade Commission ("FTC" or "Commission") is issuing this statement to provide guidance regarding its enforcement policy with respect to

---

[94] AGs, #462, Attachment at 10.
[95] *See, e.g.,* Weldbend, #597; Vaughan & Bushnell, #616; American Iron & Steel Institute, #636.
[96] TCA, #618, p. 3.

[97] *See, e.g.,* American Hand Tool, #622; Traficant, #231 Visclosky, #236; NCL, #640; Matco, #600.
[98] AGs, #462. at 4–5.

Federal Register / Vol. 62, No. 231 / Tuesday, December 2, 1997 / Notices    **63767**

the use of "Made in USA" and other U.S. origin claims in advertising and labeling. The Commission has determined, as explained below, that unqualified U.S. origin claims should be substantiated by evidence that the product is all or virtually all made in the United States. This statement is intended to elaborate on principles set out in individual cases and advisory opinions previously issued over the course of many years by the Commission. This statement, furthermore, is the culmination of a comprehensive process in which the Commission has reviewed its standard for evaluating U.S. origin claims. Throughout this process, the Commission has solicited and received, substantial public input on relevant issues. The Commission anticipates that from time to time, it may be in the public interest to solicit further public comment on these issues and to assess whether the views expressed in this statement continue to be appropriate and reflect consumer perception and opinion, and to determine whether there are areas on which the Commission could provide additional guidance.

The principles set forth in this enforcement policy statement apply to U.S. origin claims included in labeling, advertising, other promotional materials, and all other forms of marketing, including marketing through digital or electronic means such as the Internet or electronic mail. The statement, moreover, articulates the Commission's enforcement policy with respect to U.S. origin claims for all products advertised or sold in the United States, with the exception of those products specifically subject to the country-of-origin labeling requirements of the Textile Fiber Products Identification Act,[99] the Wool Products Labeling Act,[100] or the Fur Products Labeling Act.[101] With respect to automobiles or other passenger motor vehicles, nothing in this enforcement policy statement is intended to affect or alter a marketer's obligation to comply with the requirements of the American Automobile Labeling Act [102] or regulations issued pursuant thereto, and any representation required by that Act to appear on automobile labeling will not be considered a deceptive act or practice for purposes of this enforcement policy statement, regardless of whether the representation appears in labeling, advertising or in other promotional material. Claims

about the U.S. origin of passenger motor vehicles other than those representations required by the American Automobile Labeling Act, however, will be governed by the principles set forth in this statement.

## II. Background

Both the FTC and the U.S. Customs Service have responsibilities related to the use of country-of-origin claims. While the FTC regulates claims of U.S. origin under its general authority to act against deceptive acts and practices, foreign-origin markings on products (e.g., "Made in Japan") are regulated primarily by the U.S. Customs Service ("Customs" or "the Customs Service") under the Tariff Act of 1930. Specifically, Section 304 of the Tariff Act, 19 U.S.C. 1304, administered by the Secretary of the Treasury and the Customs Service, requires that all products of foreign origin imported into the United States be marked with the name of a foreign country of origin. Where an imported product incorporates materials and/or processing from more than one country, Customs considers the country of origin to be the last country in which a "substantial transformation" took place. A substantial transformation is a manufacturing or other process that results in a new and different article of commerce, having a new name, character and use that is different from that which existed prior to the processing. Country-of-origin determinations using the substantial transformation test are made on a case-by-case basis through administrative determinations by the Customs Service.[103]

The FTC also has jurisdiction over foreign origin claims in packaging insofar as they go beyond the disclosures required by the Customs Service (e.g., claims that supplement a required foreign origin marking, so as to represent where additional processing or finishing of a product occurred). In addition, the Commission has jurisdiction over foreign-origin claims in advertising, which the U.S. Customs Service does not regulate.

Where Customs determines that a good is not of foreign origin (i.e., the good undergoes its last substantial transformation in the United States), there is generally no requirement that it be marked with any country of origin. For most goods, neither the Customs Service nor the FTC requires that goods made partially or wholly in the United

States be labeled with "Made in USA" or any other indication of U.S. origin.[104] The fact that a product is not required to be marked with a foreign country of origin does not mean that it is permissible to promote that product as "Made in USA." The FTC will consider additional factors, beyond those considered by the Customs Service in determining whether a product is of foreign origin, in determining whether a product may properly be represented as "Made in USA."

This statement is intended to address only those issues related to U.S. origin claims. In developing appropriate country-of-origin labeling for their products, marketers are urged also to consult the U.S. Customs Service's marking regulations.

## III. Interpreting U.S. Origin Claims: The FTC's Deception Analysis

The Commission's authority to regulate U.S. origin claims derives from Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. 45, which prohibits "unfair or deceptive acts or practices." The Commission has set forth its interpretations of its Section 5 authority in its Deception Policy Statement,[105] and its Policy Statement Regarding Advertising Substantiation Doctrine.[106] As set out in the Deception Policy Statement, the Commission will find an advertisement or label deceptive under Section 5, and therefore unlawful, if it contains a representation or omission of fact that is likely to mislead consumers acting reasonably under the circumstances, and that representation or omission is material. In addition, objective claims carry with them the implication that they are supported by valid evidence. It is deceptive, therefore, to make a claim unless, at the time the claim is made, the marketer possesses and relies upon a reasonable basis substantiating the claim. Thus, a "Made in USA" claim, like any other objective advertising claim, must be truthful and substantiated.

A representation may be made by either express or implied claims. "Made in USA" and "Our products are American made" would be examples of express U.S. origin claims. In

---

[99] 15 U.S.C. 70.

[100] 15 U.S.C. 68.

[101] 15 U.S.C. 69.

[102] 49 U.S.C. 32304.

[103] For goods from NAFTA countries, determinations are codified in "tariff shift" regulations. 19 CFR 102.

[104] For a limited number of goods, such as textile, wool, and fur products, there are, however, statutory requirements that the U.S. processing or manufacturing that occurred be disclosed. See, e.g., Textile Fiber Products Identification Act, 15 U.S.C. 70(b).

[105] Letter from the Commission to the Honorable John D. Dingell, Chairman, Committee on Energy and Commerce, U.S. House of Representatives (Oct. 14, 1983); reprinted in Cliffdale Associates, Inc., 103 F.T.C. 110, appendix (1984).

[106] 49 FR 30,999 (1984); reprinted in Thompson Medical Co., 104 F.T.C. 648, appendix (1984).

**63768**    **Federal Register** / Vol. 62, No. 231 / Tuesday, December 2, 1997 / Notices

identifying implied claims, the Commission focuses on the overall net impression of an advertisement, label, or other promotional material. This requires an examination of both the representation and the overall context, including the juxtaposition of phrases and images, and the nature of the transaction. Depending on the context, U.S. symbols or geographic references, such as U.S. flags, outlines of U.S. maps, or references to U.S. locations of headquarters or factories, may, by themselves or in conjunction with other phrases or images, convey a claim of U.S. origin. For example, assume that a company advertises its product in an advertisement that features pictures of employees at work at what is identified as the company's U.S. factory, these pictures are superimposed on an image of a U.S. flag, and the advertisement bears the headline "American Quality." Although there is no express representation that the company's product is "Made in USA," the net impression of the advertisement is likely to convey to consumers a claim that the product is of U.S. origin.

Whether any particular symbol or phrase, including an American flag, conveys an implied U.S. origin claim, will depend upon the circumstances in which the symbol or phrase is used. Ordinarily, however, the Commission will not consider a marketer's use of an American brand name [107] or trademark,[108] without more, to constitute a U.S. origin claim, even though some consumers may believe, in some cases mistakenly, that a product made by a U.S.-based manufacturer is made in the United States. Similarly, the mere listing of a company's U.S. address on a package label, in a nonprominent manner, such as would be required under the Fair Packaging and Labeling Act,[109] is unlikely, without more, to constitute a "Made in USA" claim.

## IV. Substantiating U.S. Origin Claims: The "All or Virtually All" Standard

Based on its review of the traditional use of the term "Made in USA," and the record as a whole, the Commission concludes that consumers are likely to understand an unqualified U.S. origin claim to mean that the advertised product is "all or virtually all" made in the United States. Therefore, when a marketer makes an unqualified claim

that a product is "Made in USA," it should, at the time the representation is made, possess and rely upon a reasonable basis that the product is in fact all or virtually all made in the United States.[110, 111]

A product that is all or virtually all made in the United States will ordinarily be one in which all significant parts [112] and processing that go into the product are of U.S. origin. In other words, where a product is labeled or otherwise advertised with an unqualified "Made in USA" claim, it should contain only a de minimis, or negligible, amount of foreign content. Although there is no single "bright line" to establish when a product is or is not "all or virtually all" made in the United States, there are a number of factors that the Commission will look to in making this determination. To begin with, in order for a product to be considered "all or virtually all" made in the United States, the final assembly or processing of the product must take place in the United States. Beyond this minimum threshold, the Commission will consider other factors, including but not limited to the portion of the product's total manufacturing costs that are attributable to U.S. parts and processing; and how far removed from the finished product any foreign content is.

### A. Site of Final Assembly or Processing

The consumer perception evidence available to the Commission indicates that the country in which a product is put together or completed is highly significant to consumers in evaluating where the product is "made." Thus, regardless of the extent of a product's other U.S. parts or processing, in order to be considered all or virtually all made in the United States, it is a prerequisite that the product have been last "substantially transformed" in the United States, as that term is used by the U.S. Customs Service " i.e., the product should not be required to be marked "made in [foreign country]" under 19 U.S.C. 1304.[113] Furthermore, even where a product is last substantially transformed in the United States, if the product is thereafter assembled or processed (beyond de minimis finishing processes) outside the United States, the Commission is unlikely to consider that product to be all or virtually all made in the United States. For example, were a product to be manufactured primarily in the United States (and last substantially transformed there) but sent to Canada or Mexico for final assembly, any U.S. origin claim should be qualified to disclose the assembly that took place outside the United States.

### B. Proportion of U.S. Manufacturing Costs

Assuming the product is put together or otherwise completed in the United States, the Commission will also examine the percentage of the total cost of manufacturing the product that is attributable to U.S. costs (i.e., U.S. parts and processing) and to foreign costs.[114] Where the percentage of foreign content is very low, of course, it is more likely that the Commission will consider the

---

[107] This assumes that the brand name does not specifically denote U.S. origin, e.g., the brand name is not "Made in America, Inc."

[108] For example, a legal trademark consisting of, or incorporating, a stylized mark suggestive of a U.S. flag will not, by itself, be considered to constitute a U.S. origin claim.

[109] 15 U.S.C. 1451 et seq.

[110] For purposes of this Enforcement Policy Statement, "United States" refers to the several states, the District of Columbia, and the territories and possessions of the United States. In other words, an unqualified "Made in USA" claim may be made for a product that is all or virtually all manufactured in U.S. territories or possessions as well as in the 50 states.

[111] In addition, marketers should not represent, either expressly or by implication, that a whole product line is of U.S. origin (e.g., "Our products are Made in USA") when only some products in the product line are, in fact, made in the United States. Although not the focus of this Enforcement Policy Statement, this is a principle that has been addressed in Commission cases both within and outside the U.S. origin context. See, e.g., Hyde Athletic Industries, FTC Docket No. C–3695 (consent order December 4, 1996) (complaint alleged that respondent represented that all of its footwear was made in the United States, when a substantial amount of its footwear was made wholly in foreign countries); New Balance Athletic Shoes, Inc., FTC Docket No. 9268 (consent order December 2, 1996) (same); Uno Restaurant Corp., FTC Docket No. C–3730 (consent order April 4, 1997) (complaint alleged that restaurant chain represented that its whole line of thin crust pizzas were low fat, when only two of eight pizzas met acceptable limits for low fat claims); Häagen-Dazs Company, Inc., FTC Docket No. C–3582 (consent order June 7, 1995) (complaint alleged that respondent represented that its entire line of frozen yogurt was 98% fat free when only certain flavors were 98% fat free).

[112] The word "parts" is used in its general sense throughout this enforcement policy statement to refer to all physical inputs into a product, including but not limited to subassemblies, components, parts, or materials.

[113] It is conceivable, for example, that occasionally a product imported into the United States could have a very high proportion of its manufacturing costs be U.S. costs, but is nonetheless not considered by the U.S. Customs Service to have been last substantially transformed in the United States. In such cases, the product would be required to be marked with a foreign country of origin and an unqualified U.S. origin claim could not appropriately be made for the product.

[114] In calculating manufacturing costs, manufacturers should ordinarily use as their measure the cost of goods sold or finished goods inventory cost, as those terms are used in accordance with generally accepted accounting principles. Such costs will generally include (and be limited to) the cost of manufacturing materials, direct manufacturing labor, and manufacturing overhead. Marketers should also note the admonishment below that, in determining the percentage of U.S. content, they should look far enough back in the manufacturing process that a reasonable marketer would expect that it had accounted for any significant foreign content.

product all or virtually all made in the United States. Nonetheless, there is not a fixed point for all products at which they suddenly become "all or virtually all" made in the United States. Rather, the Commission will conduct this inquiry on a case-by-case basis, balancing the proportion of U.S. manufacturing costs along with the other factors discussed herein, and taking into account the nature of the product and consumers' expectations in determining whether an enforcement action is warranted. Where, for example, a product has an extremely high amount of U.S. content, any potential deception resulting from an unqualified "Made in USA" claim is likely to be very limited, and therefore the costs of bringing an enforcement action challenging such a claim are likely to substantially outweigh any benefit that might accrue to consumers and competition.

## C. Remoteness of Foreign Content

Finally, in evaluating whether any foreign content is significant enough to prevent a product from being considered all or virtually all made in the United States, the Commission will look not only to the percentage of the cost of the product that the foreign content represents, but will also consider how far removed from the finished product the foreign content is. As a general rule, in determining the percentage of U.S. content in its product, a marketer should look far enough back in the manufacturing process that a reasonable marketer would expect that it had accounted for any significant foreign content. In other words, a manufacturer who buys a component from a U.S. supplier, which component is in turn made up of other parts or materials, may not simply assume that the component is 100% U.S. made, but should inquire of the supplier as to the percentage of U.S. content in the component.[115] Foreign

content that is incorporated further back in the manufacturing process, however, will often be less significant to consumers than that which constitutes a direct input into the finished product. For example, in the context of a complex product, such as a computer, it is likely to be insignificant that imported steel is used in making one part of a single component (e.g., the frame of the floppy drive). This is because the steel in such a case is likely to constitute a very small portion of the total cost of the computer, and because consumers purchasing a computer are likely, if they are concerned about the origin of the product, to be concerned with the origin of the more immediate inputs (floppy drive, hard drive, CPU, keyboard, etc.) and perhaps the parts that, in turn, make up those inputs. Consumers are less likely to have in mind materials, such as the steel, that are several steps back in the manufacturing process. By contrast, in the context of a product such as a pipe or a wrench for which steel constitutes a more direct and significant input, the fact that the steel is imported is likely to be a significant factor in evaluating whether the finished product is all or virtually all made in the United States. Thus, in some circumstances, there may be inputs one or two steps back in the manufacturing process that are foreign and there may be other foreign inputs that are much further back in the manufacturing process. Those foreign inputs far removed from the finished product, if not significant, are unlikely to be as important to consumers and change the nature of what otherwise would be considered a domestic product.

In this analysis, raw materials[116] are neither automatically included nor automatically excluded in the evaluation of whether a product is all or virtually all made in the United States. Instead, whether a product whose other parts and processing are of U.S. origin would not be considered all or virtually all made in the United States because the product incorporated imported raw materials depends (as would be the case with any other input) on what percentage of the cost of the product the raw materials constitute and how far removed from the finished product the raw materials are.[117] Thus, were the

gold in a gold ring, or the clay used to make a ceramic tile, imported, an unqualified "Made in USA" claim for the ring or tile would likely be inappropriate.[118] This is both because of the significant value the gold and the clay are likely to represent relative to the finished product and because the gold and the clay are only one step back from the finished articles and are integral components of those articles. By contrast were the plastic in the plastic case of a clock radio that was otherwise all or virtually all made in the United States found to have been made from imported petroleum, the petroleum is far enough removed from, and an insignificant enough input into, the finished product that it would nonetheless likely be appropriate to label the clock radio with an unqualified U.S. origin claim.

## V. Qualifying U.S. Origin Claims

### A. Qualified U.S. Origin Claims Generally

Where a product is not all or virtually all made in the United States, any claim of U.S. origin should be adequately qualified to avoid consumer deception about the presence or amount of foreign content. In order to be effective, any qualifications or disclosures should be sufficiently clear, prominent, and understandable to prevent deception. Clarity of language, prominence of type size and style, proximity to the claim being qualified, and an absence of contrary claims that could undercut the effectiveness of the qualification will maximize the likelihood that the qualifications and disclosures are appropriately clear and prominent.

---

[115] For example, assume that a company manufactures lawn mowers in its U.S. plant, making most of the parts (housing, blade, handle, etc.) itself from U.S. materials. The engine, which constitutes 50% of the total cost of manufacturing the lawn mower, is bought from a U.S. supplier, which, the lawn mower manufacturer knows, assembles the engine in a U.S. factory. Although most of the parts and the final assembly of the lawn mower are of U.S. origin and the engine is assembled in the United States, the lawn mower will not necessarily be considered all or virtually all made in the United States. This is because the engine itself is made up of various parts that may be imported and that may constitute a significant percentage of the total cost of manufacturing the lawn mower. Thus, before labeling its lawn mower "Made in USA," the manufacturer should look to its engine supplier for more specific information as to the engine's origin. For instance, were foreign parts to constitute 60% of the cost of producing the engine, then the lawn mower would contain a total

of at least 30% foreign content, and an unqualified "Made in USA" label would be inappropriate.

[116] For purposes of this Enforcement Policy Statement, the Commission considers raw materials to be products such as minerals, plants or animals that are processed no more than necessary for ordinary transportation.

[117] In addition, because raw materials, unlike manufactured inputs, may be inherently

unavailable in the United States, the Commission will also look at whether or not the raw material is indigenous to the United States, or available in commercially significant quantities. In cases where the material is not found or grown in the United States, consumers are likely to understand that a "Made in USA" claim on a product that incorporates such materials (e.g., vanilla ice cream that uses vanilla beans, which, the Commission understands, are not grown in the United States) means that all or virtually all of the product, except for those materials not available here, originated in the United States. Nonetheless, even where a raw material is nonindigenous to the United States, if that imported material constitutes the whole or essence of the finished product (e.g., the rubber in a rubber ball or the coffee beans in ground coffee), it would likely mislead consumers to label the final product with an unqualified "Made in USA" claim.

[118] Nonetheless, in these examples, other, qualified claims could be used to identify truthfully the domestic processing that took place. For example, if the gold ring was designed and fabricated in the United States, the manufacturer could say that (e.g., "designed and fabricated in U.S. with 14K imported gold"). Similarly, if the ceramic tile were manufactured in the United States from imported clay, the manufacturer could indicate that as well.

Within these guidelines, the form the qualified claim takes is up to the marketer. A marketer may make any qualified claim about the U.S. content of its products as long as the claim is truthful and substantiated. Qualified claims, for example, may be general, indicating simply the existence of unspecified foreign content (e.g., "Made in USA of U.S. and imported parts") or they may be specific, indicating the amount of U.S. content (e.g., "60% U.S. content"), the parts or materials that are imported (e.g., "Made in USA from imported leather"), or the particular foreign country from which the parts come ("Made in USA from French components").[119]

Where a qualified claim takes the form of a general U.S. origin claim accompanied by qualifying information about foreign content (e.g., "Made in USA of U.S. and imported parts" or "Manufactured in U.S. with Indonesian materials"), the Commission believes that consumers are likely to understand such a claim to mean that, whatever foreign materials or parts the product contains, the last assembly, processing, or finishing of the product occurred in the United States. Marketers therefore should avoid using such claims unless they can substantiate that this is the case for their products. In particular, such claims should only be made where the product was last substantially transformed in the United States. Where a product was last substantially transformed abroad, and is therefore required by the U.S. Customs Service to be labeled "Made in [foreign country]," it would be inappropriate, and confusing, to use a claim such as "Made in USA of U.S. and imported parts." [120]

### B. Claims About Specific Processes or Parts

Regardless of whether a product as a whole is all or virtually all made in the United States, a marketer may make a claim that a particular manufacturing or other process was performed in the United States, or that a particular part was manufactured in the United States, provided that the claim is truthful and substantiated and that reasonable consumers would understand the claim to refer to a specific process or part and not to the general manufacture of the product. This category would include claims such as that a product is "designed" or "painted" or "written" in the United States or that a specific part, e.g., the picture tube in a television, is made in the United States (even if the other parts of the television are not). Although such claims do not expressly disclose that the products contain foreign content, the Commission believes that they are normally likely to be specific enough so as not to convey a general claim of U.S. origin. More general terms, however, such as that a product is, for example, "produced," or "manufactured" in the United States, are likely to require further qualification where they are used to describe a product that is not all or virtually all made in the United States. Such terms are unlikely to convey to consumers a message limited to a particular process performed, or part manufactured, in the United States. Rather, they are likely to be understood by consumers as synonymous with "Made in USA" and therefore as unqualified U.S. origin claims.

The Commission further concludes that, in many instances, it will be appropriate for marketers to label or advertise a product as "Assembled in the United States" without further qualification. Because "assembly" potentially describes a wide range of processes, however, from simple "screwdriver" operations at the very end of the manufacturing process to the construction of a complex, finished item from basic materials, the use of this term may, in some circumstances, be confusing or misleading to consumers. To avoid possible deception, "Assembled in USA" claims should be limited to those instances where the product has undergone its principal assembly in the United States and that assembly is substantial. In addition, a

product should be last substantially transformed in the United States to properly use an "Assembled in USA" claim. This requirement ensures against potentially contradictory claims, i.e., a product claiming to be "Assembled in USA" while simultaneously being marked as "Made in [foreign country]." In many instances, this requirement will also be a minimum guarantee that the U.S. assembly operations are substantial.

### C. Comparative Claims

U.S. origin claims that contain a comparative statement (e.g., "More U.S. content than our competitor") may be made as long as the claims are truthful and substantiated. Where this is so, the Commission believes that comparative U.S. origin claims are unlikely to be deceptive even where an unqualified U.S. origin claim would be inappropriate. Comparative claims, however, should be presented in a manner that makes the basis for the comparison clear (e.g., whether the comparison is being made to another leading brand or to a previous version of the same product). Moreover, comparative claims should not be used in a manner that, directly or by implication, exaggerates the amount of U.S. content in the product, and should be based on a meaningful difference in U.S. content between the compared products. Thus, a comparative U.S. origin claim is likely to be deceptive if it is made for a product that does not have a significant amount of U.S. content or does not have significantly more U.S. content than the product to which it is being compared.

### D. U.S. Customs Rules and Qualified and Comparative U.S. Origin Claims

It is possible, in some circumstances, for marketers to make certain qualified or comparative U.S. origin claims (including claims such as that the product contains a particular amount of U.S. content, certain claims about the U.S. origin of specific processes or parts, and certain comparative claims) even for products that are last substantially transformed abroad and which therefore must be marked with a foreign country of origin. In making such claims, however, marketers are advised to take care to follow the requirements set forth by the U.S. Customs Service and to ensure, for purposes of section 5 of the FTC Act, that the claim does not deceptively suggest that the product is made with a greater amount of U.S. parts or processing than is in fact the case.

In looking at the interaction between the requirements for qualified and

---

[119] These examples are intended to be illustrative, not exhaustive; they do not represent the only claims or disclosures that would be permissible under Section 5 of the FTC Act. As indicated, however, qualified claims, like any claim, should be truthful and substantiated and should not overstate the U.S. content of a product. For example, it would be inappropriate for a marketer to represent that a product was "Made in U.S. of U.S. and imported parts" if the overwhelming majority of the parts were imported and only a single, insignificant part was manufactured in the United States; a more appropriate claim would be "Made in U.S. of imported parts."

[120] On the other hand, that the last substantial transformation of the product takes place in the United States may not alone be sufficient to substantiate such a claim. For example, under the rulings of the U.S. Customs Service, a disposable razor is considered to have been last substantially transformed where its blade is made, even if it is thereafter assembled in another country. Thus, a disposable razor that is assembled in Mexico with a U.S.-made blade and other parts of various origins would be considered to have been last substantially transformed in the United States and would not have to bear a foreign country-of-origin marking. Nonetheless, because the final assembly of the razor occurs abroad, it would be inappropriate to label

the razor "Made in U.S. of U.S. and imported parts." It would, however, likely be appropriate to label the razor "Assembled in Mexico with U.S.-made blade," "'Blade made in United States, razor assembled in Mexico" or "Assembled in Mexico with U.S. and imported parts."

comparative U.S. origin claims and those for foreign origin marking, the analysis is slightly different for advertising and for labeling. This is a result of the fact that the Tariff Act requires foreign origin markings on articles or their containers, but does not govern claims in advertising or other promotional materials.

Thus, on a product label, where the Tariff Act requires that the product be marked with a foreign country of origin, Customs regulations permit indications of U.S. origin only when the foreign country of origin appears in close proximity and is at least of comparable size.[121] As a result, under Customs regulations, a product may, for example, be properly marked "Made in Switzerland, finished in U.S." or "Made in France with U.S. parts," but it may not simply be labeled "Finished in U.S." or "Made with U.S. parts" if it is deemed to be of foreign origin.

In advertising or other promotional materials, the Tariff Act does not require that foreign origin be indicated. The Commission recognizes that it may be possible to make a U.S. origin claim in advertising or promotional materials that is sufficiently specific or limited that it does not require an accompanying statement of foreign manufacture in order to avoid conveying a broader and unsubstantiated meaning to consumers.

---

[121] 19 CFR 134.46. Specifically, this provision provides that:

"In any case in which the words 'United States,' or 'American,' the letters U.S.A., any variation of such words or letters, or the name of any city or locality in the United States, or the name of any foreign country or locality other than the country or locality in which the article was manufactured or produced appear on an imported article or its container, and those words, letters or names may mislead or deceive the ultimate purchaser as to the actual country of origin of the article, there shall appear, legibly and permanently, in close proximity to such words, letters or name, and in at least a comparable size, the name of the country of origin preceded by 'Made in,' 'Product of,' or other words of similar meaning."

In a Federal Register notice announcing amendments to this provision, the Customs Service indicated that, where a product has a foreign origin, any references to the United States made in the context of a statement relating to any aspect of the production or distribution of the product (e.g., "Designed in USA," "Made for XYZ Corporation, California, U.S.A.," or "Distributed by ABC, Inc., Colorado, USA") would be considered misleading to the ultimate purchaser and would require foreign country-of-origin marking in accordance with the above provision. 62 FR 44211, 442213 (Aug. 20, 1997).

---

Whether a nominally specific or limited claim will in fact be interpreted by consumers in a limited matter is likely to depend on the connotations of the particular representation being made (e.g., "finished" may be perceived as having a more general meaning than "painted") and the context in which it appears. Marketers who wish to make U.S. origin claims in advertising or other promotional materials without an express disclosure of foreign manufacture for products that are required by Customs to be marked with a foreign country of origin should be aware that consumers may believe the literal U.S. origin statement is implying a broader meaning and a larger amount of U.S. content than expressly represented. Marketers are required to substantiate implied, as well express, material claims that consumers acting reasonably in the circumstances take from the representations. Therefore, the Commission encourages marketers, where a foreign-origin marking is required by Customs on the product itself, to include in any qualified or comparative U.S. origin claim a clear, conspicuous, and understandable disclosure of foreign manufacture.

By direction of the Commission.

**Donald S. Clark,**
*Secretary.*

**Concurring Statement of Commissioner Roscoe B. Starek, III, Regarding Enforcement Policy Statement on U.S. Origin Claims**

File No. P89-4219

Today the Commission restores the "Made in USA" standard to the highly demanding level that we affirmed in 1994. The Commission's action reinstates the longstanding principle that an unqualified U.S. origin claim is a claim that the product is made entirely in the United States except for a *de minimis* or negligible amount of foreign content. By explaining the factors that the Commission will consider in assessing whether an unqualified "Made in USA" claim is deceptive, and whether the public interest warrants enforcement action, the Policy Statement provides guidance that should reduce the costs of making "Made in USA" claims that comply with Section 5 of the FTC Act. The current state of consumer perception

---

and the benefits and costs of various "Made in USA" standards have been exhaustively investigated. With the issuance of this Policy Statement, I expect to see the traditional "Made in USA" standard enforced, now that we no longer labor under the self-imposed moratorium that consumed several years while we explored various policy options.

The broad review initiated by a majority of the Commission in 1995 produced a reasonable alternative approach based on copy test evidence showing that significant minorities of consumers took contradictory meanings from unqualified "Made in USA" claims. As I stated when we proposed the Guides for comment, the "substantially all" standard created by the Guides appeared to strike the correct balance between contradictory consumer understandings of "Made in USA" so as to minimize overall consumer injury from deception. Today's action illustrates the value of seeking public comment when the Commission elects to fashion a compromise through an expansive review similar to a rulemaking, rather than base its findings of deception on evidence and interpretations tested during litigation and the pursuit of negotiated orders.

Intense public interest in "Made in USA" claims inspired more individual consumer comments than we have received in almost any other comment period during my tenure at the Commission. These comments—which demonstrate that consumers who believe that "Made in USA" means all or virtually all made in the United States are highly motivated to act on their belief—justify redrawing the balance that the proposed Guides attempted to strike. These consumers want to be able to rely on a simple and clear standard, and their awareness of the globalization of the economy evidently has not changed their beliefs about domestic origin claims. The Policy Statement also wisely confines the Commission's guidance to general principles and, as I clearly prefer, leaves for case-by-case resolution more complex issues that may turn on variations in claims and products.

[FR Doc. 97-31531 Filed 12-1-97; 8:45 am]

BILLING CODE 6750-01-P

Exhibit "B"

LexisNexis® *Total Research System*    Custom ID ▼  lexis id ┆ Switch Client ┆ Preferences ┆ Sign Out ┆ ? Help

Search ┆ Research Tasks ┆ Get a Document ┆ Shepard's® ┆ Alerts ┆ Total Litigator ┆ Transactional Advisor ┆ Cour

Service: **Get by LEXSEE®**
Citation: **140 cong rec h 6209**

☛Select for FOCUS™ or Delivery
☐

*140 Cong Rec H 6209, ***

CONGRESSIONAL RECORD -- *House*

Tuesday, July 26, 1994

103rd Congress 2nd Session

140 Cong Rec H 6209

**REFERENCE:** Vol. 140 No. 99

**TITLE:** MOTION TO INSTRUCT CONFEREES ON H.R. 3355, VIOLENT CRIME CONTROL AND LAW ENFORCEMENT ACT OF 1993

**SPEAKER:** MR. TRAFICANT

**TEXT:**

**[*H6209]**

Mr. TRAFICANT. Mr. Speaker, I offer a motion to instruct conferees on the bill (H. R. 3355) to amend the Omnibus Crime Control and Safe Streets Act of 1968 to allow grants to increase police presence, to expand and improve cooperative efforts between law enforcement agencies and members of the community to address crime and disorder problems, and otherwise to enhance public safety.

The SPEAKER pro tempore (Mr. Montgomery ). The Clerk will report the motion.

The Clerk read as follows:

Mr. Traficant moves that the managers on the part of the House at the conference on the disagreeing votes of the two Houses on the House amendment to the Senate amendment to the bill H.R. 3355 be instructed to insist upon the provisions contained in the amendment offered by Mr. Traficant, as agreed to by the House, relating to the requirements in the representation of domestic origin in labeling of products.

The SPEAKER pro tempore. The gentleman from Ohio (Mr. Traficant ) is recognized for 30 minutes.

Mr. TRAFICANT. Mr. Speaker, I yield myself such time as I may consume.

Mr. Speaker, I did not want to come over and take the time of the Congress with a motion to instruct, and I realize that it is not binding, but there is a problem that we have. I want to make it explicit and spread across the Record of the Congress that this is an important issue and one I do not want overlooked in conference.

My amendment that was offered on the crime bill basically set up provisions, criminal penalties on someone who would affix a fraudulent "Made in America" label to some imported item.

1350

At the time that amendment was opposed by the committee chair, the gentleman from Texas (Mr. Brooks ), and there were some reservations, but nevertheless, this Congress in an overwhelming fashion approved that legislation, and it is the only legislation on a crime bill that deals with American jobs, and these fraudulent labels that are being placed on some imports that are helping to wreck American jobs.

Now, I said at the time that I would provide any leeway for whatever compromise could be made on this amendment, and that I urged the conference to in fact do that, but to keep in place the general intent of what that amendment stood for to, in fact, at least develop a process of challenging these fraudulent "Made in America" labels.

Now, it is bad enough that some of these imports coming in here actually are made by slave laborers in prison camps in places like China and other spots around the world, but then they come in here and they get a fake "Made in America" label put on them, and the American consumer believes, "My God, these products are actually made by our neighbors and the citizens in our country," and they are even sold many times under the guise of being American-made. That is absolutely unbelievable to me, intolerable. Something has to be done.

This is the place to do it.

With all of this fighting and infighting on germaneness on many of these other bills, what brought this matter to light recently is a matter that occurred down in Florence, KY, right south of Cincinnati, OH, a company called Mazak, Inc. One of us would think that is just some little welding outfit, a couple of Americans that put together a nice plan, but that is really not the case. Mazak, Inc., is a wholly owned Japanese subsidiary of Yamizaki, Inc., one of the biggest machine-tool industry companies in the entire world. Here is what it boiled down to, and it did not take the Commerce Department or the Congress to do something about it.

"60 Minutes," CBS's "60 Minutes," was responsible finally for bringing this to the attention of the American people.

Now, I want you to listen to this, because I want this in the bill. I want Congress to stand with me in this, on this matter, in the bill, and I want some negotiated settlement at least to make this happen.

Here is what occurred: Mazak, Inc., had a contract, a defense contract, and because the items were sophisticated, under our "Buy American" provisions and our national security law, to keep in place some industrial infrastructure **[*H6210]** that could make these items, there is a Buy American provision on them.

Now, a young marine finally got tired of turning his back, and he reported and found the documentation to prove that Mazak, Inc., was importing these products and these machines made in Japan, bringing them into Houston and New Orleans, putting a fake "Made in America" label on them, and shipping them into our defense source, procurement agent. Unbelievable to me.

"60 Minutes" brought it to the attention of the American people. The American people were

rightfully so incensed by this behavior, and something has got to be done.

So I did pass an amendment, and an amendment that was voted on, an amendment that was overwhelmingly approved by the House. Now, I have heard there are some powerful Senators who have a couple of companies that called them and said, "We do not want that Traficant amendment. Kill it."

Ladies and gentlemen of the Congress, who other than a person that might violate this law would oppose this law?

I have never come to the floor in 10 years, but I am asking the Congress of the United States, the House of Representatives, to tell the other body, "By God, we are willing to accept some compromise language, but we will not be shut out, and we are tired of fraudulent labels."

Now, we are either going to do this, Congress, or we might as well just send out the band and play a few tunes and let the jobs keep going overseas, because we are screwing American workers. That is the bottom line.

Mr. Speaker, I yield 2 minutes to the gentleman from Indiana (Mr. Burton ).

Mr. BURTON of Indiana. Mr. Speaker, I think the gentleman from Ohio makes some very valid points and arguments.

That amendment to which he referred which he sponsored passed the House of Representatives overwhelmingly, and I think that it should be left in the conference committee report.

There are cases that we know about where slave-labor-made items from China and elsewhere came into this country and have been relabeled "Made in America." That is something that should not be tolerated. I conjure with him that there should be criminal penalties imposed for that kind of activity.

For that reason, as a Republican, in order to show there is bipartisan support for this, I urge my colleagues on a voice vote to accept his resolution here today that we instruct our conferees to accept a Buy American provision and impose criminal penalties for anybody who tampers with items made overseas that would lead one to believe that they were made in America when they are not.

I congratulate my colleague and urge all of my colleagues to support it.

Mr. TRAFICANT. Mr. Speaker, I yield myself such time as I may consume.

I have a brief closing statement I would like to read into the Record .

This is by no stretch of the imagination questioning the decision of the chairman, the gentleman from Texas (Mr. Brooks ) in the conference. The gentleman from Texas (Mr. Brooks ), the chairman, and his staff have worked out a reasonable compromise, and the gentleman from Texas (Mr. Brooks ) is supporting that compromise, and this is not in fact questioning the handling by the chairman, the gentleman from Texas (Mr. Brooks ) of this matter. He supports this.

But there has been language that is worked out, and I would like to share that briefly upon the record before I close. The proposed substitute would read, and I quote:

Proposed Substitute for Subtitle R-Labels on Products-Crime Bill

SEC. 3086.

To the extent any person introduces, delivers for introduction, sells, advertises, or offers for sale in commerce a product with a "Made in the U.S.A." or "Made in America" label, or the equivalent thereof, in order to represent that such product was in whole or substantial part of domestic origin, such label shall be consistent with decisions and orders of the Federal Trade Commission issued pursuant to section 5 of the Federal Trade Commission Act. This section only applies to such labels. Nothing in this section shall preclude the application of other provisions of law relating to labeling. The Commission may periodically consider an appropriate percentage of imported components which may be included, in the product and still be reasonably consistent with such decisions and orders. Nothing in this section shall preclude use of such labels for products that contain imported components under the label when the label also discloses such information in a clear and conspicuous manner. The Commission shall administer this section pursuant to section 5 of the Federal Trade Commission Act and may from time to time issue rules pursuant to section 553 of Title 5, United States Code for such purpose. If a rule is issued, such violation shall be treated by the Commission as a violation of a rule under section 18 of the Federal Trade Commissions Act (15 U.S.C. 57a) regarding unfair or deceptive acts or practices. This section shall be effective upon publication in the Federal Register of the provisions of this section. The Commission shall publish such notice within six months after the enactment of this section.

Mr. Speaker, that compromise language is fine. Nobody in the House has a problem with it. I would like to say this in closing to the House, if you let a Senator, one or two Senators, who have a company in their district who more than likely is violating this provision is the only reason why they would oppose it, get over and strike for the American workplace the protection of our American workers, this simple, objective, fair, and prudent language, then God almighty, who governs anymore?

And what do we do around here? I insist on the provision passed in the House dealing with fraudulent labels as it relates to Mazak, Inc., and many other such cases, that the Congress stand firm and in fact insist that that be kept in the bill in at least some form.

Mr. Speaker, with that, if there are no other Members to speak on the issue, I have no further requests for time, and I yield back the balance of my time.

The SPEAKER pro tempore (Mr. Montgomery ). Without objection, the previous question is ordered on the motion to instruct.

There was no objection.

The SPEAKER pro tempore. The question is on the motion offered by the gentleman from Ohio (Mr. Traficant ).

The motion was agreed to.

A motion to reconsider was laid on the table.

**SUBJECT:** LEGISLATION (89%); LEGISLATIVE BODIES (79%); LAW ENFORCEMENT (79%);

Service: **Get by LEXSEE®**
Citation: **140 cong rec h 6209**
View: Full
Date/Time: Wednesday, June 25, 2008 - 6:27 PM EDT

Exhibit "C"

**Federal Trade Commission**
**Protecting America's Consumers**

---

*Facts for Business*
Email | PDF Format

---

# Complying with the Made In the USA Standard

## Introduction

The Federal Trade Commission (FTC) is charged with preventing deception and unfairness in the marketplace. The FTC Act gives the Commission the power to bring law enforcement actions against false or misleading claims that a product is of U.S. origin. Traditionally, the Commission has required that a product advertised as Made in USA be "all or virtually all" made in the U.S. After a comprehensive review of Made in USA and other U.S. origin claims in product advertising and labeling, the Commission announced in December 1997 that it would retain the "all or virtually all" standard. The Commission also issued an Enforcement Policy Statement on U.S. Origin Claims to provide guidance to marketers who want to make an unqualified Made in USA claim under the "all or virtually all" standard and those who want to make a qualified Made in USA claim.

This publication provides additional guidance about how to comply with the "all or virtually all" standard. It also offers some general information about the U.S. Customs Service's requirement that all products of foreign origin imported into the U.S. be marked with the name of the country of origin.

This publication is the Federal Trade Commission staff's view of the law's requirements. It is not binding on the Commission. The Enforcement Policy Statement issued by the FTC is at the end of the publication.

## Basic Information About Made In USA Claims

### Must U.S. content be disclosed on products sold in the U.S.?

U.S. content must be disclosed on automobiles and textile, wool, and fur products. There's no law that requires most other products sold in the U.S. to be marked or labeled Made in USA or have any other disclosure about their amount of U.S. content. However, manufacturers and marketers who choose to make claims about the amount of U.S. content in their products must comply with the FTC's Made in USA policy.

### What products does the FTC's Made in USA policy apply to?

The policy applies to all products advertised or sold in the U.S., except for those specifically subject to country-of-origin labeling by other laws . Other countries may have their own country-of-origin marking requirements. As a result, exporters should determine whether the country to which they are exporting imposes such requirements.

### What kinds of claims does the Enforcement Policy Statement apply to?

The Enforcement Policy Statement applies to U.S. origin claims that appear on products and labeling, advertising, and other promotional materials. It also applies to all other forms of marketing, including marketing through digital or electronic mechanisms, such as Internet or e-mail.

### A Made in USA claim can be express or implied.

**Examples** of express claims: Made in USA. "Our products are American-made." "USA."

In identifying implied claims, the Commission focuses on the overall impression of the advertising, label, or promotional material. Depending on the context, U.S. symbols or geographic references (for example, U.S. flags, outlines of U.S. maps, or references to U.S. locations of headquarters or factories) may convey a claim of U.S. origin either by themselves, or in conjunction with other phrases or images.

**Example:** A company promotes its product in an ad that features a manager describing the "true American quality" of the work produced at the company's American factory. Although there is no express representation that the company's product is made in the U.S., the overall — or net — impression the ad is likely to convey to consumers is that the product is of U.S. origin.

## Brand names and trademarks

Ordinarily, the Commission will not consider a manufacturer or marketer's use of an American brand name or trademark by itself as a U.S. origin claim. Similarly, the Commission is not likely to interpret the mere listing of a company's U.S. address on a package label in a non-prominent way as a claim of U.S. origin.

**Example:** A product is manufactured abroad by a well-known U.S. company. The fact that the company is headquartered in the U.S. also is widely known. Company pamphlets for its foreign-made product prominently feature its brand name. Assuming that the brand name does not specifically denote U.S. origin (that is, the brand name is not "Made in America, Inc."), using the brand name by itself does not constitute a claim of U.S. origin.

## Representations about entire product lines

Manufacturers and marketers should not indicate, either expressly or implicitly, that a whole product line is of U.S. origin ("Our products are made in USA") when only some products in the product line are made in the U.S. according to the "all or virtually all" standard.

## Does the FTC pre-approve Made in USA claims?

The Commission does not pre-approve advertising or labeling claims. A company doesn't need approval from the Commission before making a Made in USA claim. As with most other advertising claims, a manufacturer or marketer may make any claim as long as it is truthful and substantiated.

# The Standard For Unqualified Made In USA Claims

## What is the standard for a product to be called Made in USA without qualification?

For a product to be called Made in USA, or claimed to be of domestic origin without qualifications or limits on the claim, the product must be "all or virtually all" made in the U.S. The term "United States," as referred to in the Enforcement Policy Statement, includes the 50 states, the District of Columbia, and the U.S. territories and possessions.

## What does "all or virtually all" mean?

"All or virtually all" means that all significant parts and processing that go into the product must be of U.S. origin. That is, the product should contain no — or negligible — foreign content.

## What substantiation is required for a Made in USA claim?

When a manufacturer or marketer makes an unqualified claim that a product is Made in USA, it should have — and rely on — a "reasonable basis" to support the claim at the time it is made. This means a manufacturer or marketer needs competent and reliable evidence to back up the claim that its product is "all or virtually all" made in the U.S.

## What factors does the Commission consider to determine whether a product is "all or virtually all" made in the U.S.?

The product's final assembly or processing must take place in the U.S. The Commission then considers other factors, including how much of the product's total manufacturing costs can be assigned to U.S. parts and processing, and how far removed any foreign content is from the finished product. In some instances, only a small portion of the total manufacturing costs are attributable to foreign processing, but that processing represents a significant amount of the product's overall processing. The same could be true for some foreign parts. In these cases, the foreign content (processing or parts) is more than negligible, and, as a result, unqualified claims are inappropriate.

**Example:** A company produces propane barbecue grills at a plant in Nevada. The product's major components include the gas valve, burner and aluminum housing, each of which is made in the U.S. The grill's knobs and tubing are imported from Mexico. An unqualified Made in USA claim is not likely to be deceptive because the knobs and tubing make up a negligible portion of the product's total manufacturing costs and are insignificant parts of the final product.

**Example:** A table lamp is assembled in the U.S. from American-made brass, an American-made Tiffany-style lampshade, and an imported base. The base accounts for a small percent of the total cost of making the lamp. An unqualified Made in USA claim is deceptive for two reasons: The base is not far enough removed in the manufacturing process from the finished product to be of little consequence and it is a significant part of the final product.

## What items should manufacturers and marketers include in analyzing the percentage of domestic content in a particular product?

Manufacturers and marketers should use the cost of goods sold or inventory costs of finished goods in their analysis. Such costs generally are limited to the total cost of all manufacturing materials, direct manufacturing labor, and manufacturing overhead.

Should manufacturers and marketers rely on information from American suppliers about the amount of domestic content in the parts, components, and other elements they buy and use for their final products?

If given in good faith, manufacturers and marketers can rely on information from suppliers about the domestic content in the parts, components, and other elements they produce. Rather than assume that the input is 100 percent U.S.-made, however, manufacturers and marketers would be wise to ask the supplier for specific information about the percentage of U.S. content before they make a U.S. origin claim.

**Example:** A company manufactures food processors in its U.S. plant, making most of the parts, including the housing and blade, from U.S. materials. The motor, which constitutes 50 percent of the food processor's total manufacturing costs, is bought from a U.S. supplier. The food processor manufacturer knows that the motor is assembled in a U.S. factory. Even though most of the parts of the food processor are of U.S. origin, the final assembly is in the U.S., and the motor is assembled in the U.S., the food processor is not considered "all or virtually all" American-made if the motor itself is made of imported parts that constitute a significant percentage of the appliance's total manufacturing cost. Before claiming the product is Made in USA, this manufacturer should look to its motor supplier for more specific information about the motor's origin.

**Example:** On its purchase order, a company states: "Our company requires that suppliers certify the percentage of U.S. content in products supplied to us. If you are unable or unwilling to make such certification, we will not purchase from you." Appearing under this statement is the sentence, "We certify that our ____ have at least ____% U.S. content," with space for the supplier to fill in the name of the product and its percentage of U.S. content. The company generally could rely on a certification like this to determine the appropriate country-of-origin designation for its product.

## How far back in the manufacturing process should manufacturers and marketers look?

To determine the percentage of U.S. content, manufacturers and marketers should look back far enough in the manufacturing process to be reasonably sure that any significant foreign content has been included in their assessment of foreign costs. Foreign content incorporated early in the manufacturing process often will be less significant to consumers than content that is a direct part of the finished product or the parts or components produced by the immediate supplier.

**Example:** The steel used to make a single component of a complex product (for example, the steel used in the case of a computer's floppy drive) is an early input into the computer's manufacture, and is likely to constitute a very small portion of the final product's total cost. On the other hand, the steel in a product like a pipe or a wrench is a direct and significant input. Whether the steel in a pipe or wrench is imported would be a significant factor in evaluating whether the finished product is "all or virtually all" made in the U.S.

## Are raw materials included in the evaluation of whether a product is "all or virtually all" made in the U.S.?

It depends on how much of the product's cost the raw materials make up and how far removed from the finished product they are.

**Example:** If the gold in a gold ring is imported, an unqualified Made in USA claim for the ring is deceptive. That's because of the significant value the gold is likely to represent relative to the finished product, and because the gold — an integral component — is only one step back from the finished article. By contrast, consider the plastic in the plastic case of a clock radio otherwise made in the U.S. of U.S.-made components. If the plastic case was made from imported petroleum, a Made in USA claim is likely to be appropriate because the petroleum is far enough removed from the finished product, and is an insignificant part of it as well.

## Qualified Claims

### What is a qualified Made in USA claim?

A qualified Made in USA claim describes the extent, amount or type of a product's domestic content or processing; it indicates that the product isn't entirely of domestic origin.

**Example:** "60% U.S. content." "Made in USA of U.S. and imported parts." "Couch assembled in USA from Italian Leather and Mexican Frame."

### When is a qualified Made in USA claim appropriate?

A qualified Made in USA claim is appropriate for products that include U.S. content or processing but don't meet the criteria for making an unqualified Made in USA claim. Because even qualified claims may imply more domestic content than exists, manufacturers or marketers must exercise care when making these claims. That is, avoid qualified claims unless the product has a significant amount of U.S. content or U.S. processing. A qualified Made in USA claim, like an unqualified claim, must be truthful and substantiated.

**Example:** An exercise treadmill is assembled in the U.S. The assembly represents significant work and constitutes a "substantial transformation" (a term used by the U.S. Customs Service). All of the treadmill's major parts, including the motor, frame, and electronic display, are imported. A few of its incidental parts, such as the handle bar covers, the plastic on/off power key, and the treadmill mat, are manufactured in the U.S. Together, these parts account for approximately three percent of the total cost of all the parts. Because the value of the U.S.-made parts is negligible compared to the value of all the parts, a claim on the treadmill that it is "Made in USA of U.S. and Imported Parts" is deceptive. A claim like "Made in U.S. from Imported Parts" or "Assembled in U.S.A." would not be deceptive.

## U.S. origin claims for specific processes or parts

Claims that a particular manufacturing or other process was performed in the U.S. or that a particular part was manufactured in the U.S. must be truthful, substantiated, and clearly refer to the specific process or part, not to the general manufacture of the product, to avoid implying more U.S. content than exists.

Manufacturers and marketers should be cautious about using general terms, such as "produced," "created" or "manufactured" in the U.S. Words like these are unlikely to convey a message limited to a particular process. Additional qualification probably is necessary to describe a product that is not "all or virtually all" made in the U.S.

In addition, if a product is of foreign origin (that is, it has been substantially transformed abroad), manufacturers and marketers also should make sure they satisfy Customs' markings statute and regulations that require such products to be marked with a foreign country of origin. Further, Customs requires the foreign country of origin to be preceded by "Made in," "Product of," or words of similar meaning when any city or location that is not the country of origin appears on the product.

**Example:** A company designs a product in New York City and sends the blueprint to a factory in Finland for manufacturing. It labels the product "Designed in USA — Made in Finland." Such a specific processing claim would not lead a reasonable consumer to believe that the whole product was made in the U.S. The Customs Service requires the product to be marked "Made in," or "Product of" Finland since the product is of Finnish origin and the claim refers to the U.S. Examples of other specific processing claims are: "Bound in U.S. — Printed in Turkey." "Hand carved in U.S. — Wood from Philippines." "Software written in U.S. — Disk made in India." "Painted and fired in USA. Blanks made in (foreign country of origin)."

**Example:** A company advertises its product, which was invented in Seattle and manufactured in Bangladesh, as "Created in USA." This claim is deceptive because consumers are likely to interpret the term "Created" as Made in USA — an unqualified U.S. origin claim.

**Example:** A computer imported from Korea is packaged in the U.S. in an American-made corrugated paperboard box containing only domestic materials and domestically produced expanded rigid polystyrene plastic packing. Stating Made in USA on the package would deceive consumers about the origin of the product inside. But the company could legitimately make a qualified claim, such as "Computer Made in Korea — Packaging Made in USA."

**Example:** The Acme Camera Company assembles its cameras in the U.S. The camera lenses are manufactured in the U.S., but most of the remaining parts are imported. A magazine ad for the camera is headlined "Beware of Imported Imitations" and states "Other high-end camera makers use imported parts made with cheap foreign labor. But at Acme Camera, we want only the highest quality parts for our cameras and we believe in employing American workers. That's why we make all of our lenses right here in the U.S." This ad is likely to convey that more than a specific product part (the lens) is of U.S. origin. The marketer should be prepared to substantiate the broader U.S. origin claim conveyed to consumers viewing the ad.

## Comparative Claims

Comparative claims should be truthful and substantiated, and presented in a way that makes the basis for comparison clear (for example, whether the comparison is to another leading brand or to a previous version of the same product). They should truthfully describe the U.S. content of the product and be based on a meaningful difference in U.S. content between the compared products.

**Example:** An ad for cellular phones states "We use more U.S. content than any other cellular phone manufacturer." The manufacturer assembles the phones in the U.S. from American and imported components and can substantiate that the difference between the U.S. content of its phones and that of the other manufacturers' phones is significant. This comparative claim is not deceptive.

**Example:** A product is advertised as having "twice as much U.S. content as before." The U.S. content in the product has been increased from 2 percent in the previous version to 4 percent in the current version. This comparative claim is deceptive because the difference between the U.S. content in the current and previous version of the product are insignificant.

## Assembled in USA Claims

A product that includes foreign components may be called "Assembled in USA" without qualification when its principal assembly takes place in the U.S. and the assembly is substantial. For the "assembly" claim to be valid, the product's last "substantial transformation" also should have occurred in the U.S. That's why a "screwdriver" assembly in the U.S. of foreign components into a final product at the end of the manufacturing process doesn't usually qualify for the "Assembled in USA" claim.

**Example:** A lawn mower, composed of all domestic parts except for the cable sheathing, flywheel, wheel rims and air filter (15 to 20 percent foreign content) is assembled in the U.S. An "Assembled in USA" claim is appropriate.

**Example:** All the major components of a computer, including the motherboard and hard drive, are imported. The computer's components then are put together in a simple "screwdriver" operation in the U.S., are not substantially transformed under the Customs Standard, and must be marked with a foreign country of origin. An "Assembled in U.S." claim without further qualification is deceptive.

## The FTC and The Customs Service

### What is the U.S. Customs Service's jurisdiction over country-of-origin claims?

The Tariff Act gives Customs and the Secretary of the Treasury the power to administer the requirement that imported goods be marked with a foreign country of origin (for example, "Made in Japan").

When an imported product incorporates materials and/or processing from more than one country, Customs considers the country of origin to be the last country in which a "substantial transformation" took place. Customs defines "substantial transformation" as a manufacturing process that results in a new and different product with a new name, character, and use that is different from that which existed before the change. Customs makes country-of-origin determinations using the "substantial transformation" test on a case-by-case basis. In some instances, Customs uses a "tariff shift" analysis, comparable to "substantial transformation," to determine a product's country of origin.

### What is the interaction between the FTC and Customs regarding country-of-origin claims?

Even if Customs determines that an imported product does not need a foreign country-of-origin mark, it is not necessarily permissible to promote that product as Made in USA. The FTC considers additional factors to decide whether a product can be advertised or labeled as Made in USA.

Manufacturers and marketers should check with Customs to see if they need to mark their products with the foreign country of origin. If they don't, they should look at the FTC's standard to check if they can properly make a Made in USA claim.

The FTC has jurisdiction over foreign origin claims on products and in packaging that are beyond the disclosures required by Customs (for example, claims that supplement a required foreign origin marking to indicate where additional processing or finishing of a product occurred).

The FTC also has jurisdiction over foreign origin claims in advertising and other promotional materials. Unqualified U.S. origin claims in ads or other promotional materials for products that Customs requires a foreign country-of-origin mark may mislead or confuse consumers about the product's origin. To avoid misleading consumers, marketers should clearly disclose the foreign manufacture of a product.

**Example:** A television set assembled in Korea using an American-made picture tube is shipped to the U.S. The Customs Service requires the television set to be marked "Made in Korea" because that's where the television set was last "substantially transformed." The company's World Wide Web page states "Although our televisions are made abroad, they always contain U.S.-made picture tubes." This statement is not deceptive. However, making the statement "All our picture tubes are made in the USA" — without disclosing the foreign origin of the television's manufacture — might imply a broader claim (for example, that the television set is largely made in the U.S.) than could be substantiated. That is, if the statement and the entire ad imply that any foreign content or processing is negligible, the advertiser must substantiate that claim or net impression. The advertiser in this scenario would not be able to substantiate the implied Made in USA claim because the product was "substantially transformed" in Korea.

## Other Statutes

### What are the requirements of other federal statutes relating to country-of-origin determinations?

Textile Fiber Products Identification Act and Wool Products Labeling Act — Require a Made in USA label on most clothing and other textile or wool household products if the final product is manufactured in the U.S. of fabric that is manufactured in the U.S., regardless of where materials earlier in the manufacturing process (for example, the yarn and fiber) came from. Textile products that are imported must be labeled as required by the Customs Service. A textile or wool product partially manufactured in the U.S. and partially manufactured in another country must be labeled to show both foreign and domestic processing.

On a garment with a neck, the country of origin must be disclosed on the front of a label attached to the inside center of the neck — either midway between the shoulder seams or very near another label attached to the inside center of the neck. On a garment without a neck, and on other kinds of textile products, the country of origin must appear on a conspicuous and readily accessible label on the inside or outside of the product.

Catalogs and other mail order promotional materials for textile and wool products, including those disseminated on the Internet, must disclose whether a product is made in the U.S., imported or both.

The Fur Products Labeling Act requires the country of origin of imported furs to be disclosed on all labels and in all advertising. For copies of the Textile, Wool or Fur Rules and Regulations, or the new business education guide on labeling requirements, call the FTC's Consumer Response Center (202-382-4357). Or visit the FTC online at www.ftc.gov. Click on Consumer Protection.

**American Automobile Labeling Act** — Requires that each automobile manufactured on or after October 1, 1994, for sale in the U.S. bear a label disclosing where the car was assembled, the percentage of equipment that originated in the U.S. and Canada, and the country of origin of the engine and transmission. Any representation that a car marketer makes that is required by the AALA is exempt from the Commission's policy. When a company makes claims in advertising or promotional materials that go beyond the AALA requirements, it will be held to the Commission's standard. For more information, call the Consumer Programs Division of the National Highway Traffic Safety Administration (202-366-0846).

Buy American Act — Requires that a product be manufactured in the U.S. of more than 50 percent U.S. parts to be considered Made in USA for government procurement purposes. For more information, review the Buy American Act at 41 U.S.C. §§ 10a-10c, the Federal Acquisition Regulations at 48 C.F.R. Part 25, and the Trade Agreements Act at 19 U.S.C. §§ 2501-2582.

## What To Do About Violations

### What if I suspect noncompliance with the FTC's Made in USA standard or other country-of-origin mislabeling?

Information about possible illegal activity helps law enforcement officials target companies whose practices warrant scrutiny. If you suspect noncompliance, contact the Division of Enforcement, Bureau of Consumer Protection, Federal Trade Commission, Washington, DC 20580; (202) 326-2996 or send an e-mail to MUSA@ftc.gov. If you know about import or export fraud, call Customs' toll-free Commercial Fraud Hotline, 1-800-ITS-FAKE. Examples of fraudulent practices involving imports include removing a required foreign origin label before the product is delivered to the ultimate purchaser (with or without the improper substitution of a Made in USA label) and failing to label a product with a required country of origin.

You also can contact your state Attorney General and your local Better Business Bureau to report a company. Or you can refer your complaint to the National Advertising Division (NAD) of the Council of Better Business Bureaus by calling (212) 754-1320. NAD handles complaints about the truth and accuracy of national advertising. You can reach the Council of Better Business Bureaus on the web at adweb.com/adassoc17.html.

Finally, the Lanham Act gives any person (such as a competitor) who is damaged by a false designation of origin the right to sue the party making the false claim. Consult a lawyer to see if this private right of action is an appropriate course of action for you.

## For More Information

The FTC works for the consumer to prevent fraudulent, deceptive, and unfair practices in the marketplace and to provide information to businesses to help them comply with the law. To file a complaint or to get free information on consumer issues, visit ftc.gov or call toll-free, 1-877-FTC-HELP (1-877-382-4357); TTY: 1-866-653-4261. The FTC enters Internet, telemarketing, identity theft, and other fraud-related complaints into Consumer Sentinel, a secure online database available to hundreds of civil and criminal law enforcement agencies in the U.S. and abroad.

## Your Opportunity to Comment

The National Small Business Ombudsman and 10 Regional Fairness Boards collect comments from small businesses about federal compliance and enforcement activities. Each year, the Ombudsman evaluates the conduct of these activities and rates each agency's responsiveness to small businesses. Small businesses can comment to the Ombudsman without fear of reprisal. To comment, call toll-free 1-888-REGFAIR (1-888-734-3247) or go to www.sba.gov/ombudsman.

Last Modified: Friday, 08-Jun-2007 08:24:00 EDT

1  KEVIN ALEXANDER (SBN 175204)
   email: kalexander@gordonrees.com
2  RICHARD R. SPIRRA (SBN 106361)
   email: rspirra@gordonrees.com
3  GORDON & REES LLP
   101 W. Broadway, Suite 2000
4  San Diego, CA  92101
   Telephone:  (619) 696-6700
5  Facsimile:  (619) 696-7124

6

7  MANUEL SALDANA (SBN 137060)
   email: msaldana@gordonrees.com
   GORDON & REES LLP
8  633 W. 5th Street, Ste. 4900
   Los Angeles, CA  90071
9  Telephone:  (213) 576-5000
   Facsimile:  (213) 680-4470

10

11  Attorneys for Defendant
    **BIC USA, INC.**

12             UNITED STATES DISTRICT COURT

13           SOUTHERN DISTRICT OF CALIFORNIA

14

15  DONNA R. NELSON, an individual and on    )  CASE NO. 3:07-CV-2367- LAB(RBB)
    behalf of the general public,            )
16                                           )
                                             )
17                        Plaintiff,         )  PROOF OF SERVICE
                                             )
18         vs.                               )
                                             )
19  BIC USA, INC., a Delaware corporation, and )
    DOES 1 through 100, inclusive,           )
20                                           )
                          Defendants.        )
21  _____ )

22       I am a resident of the State of California, over the age of eighteen years, and not a party

23  to the within action.  My business address is: Gordon & Rees LLP 101 W. Broadway, Suite

24  2000, San Diego, CA  92101.  On July 7, 2008, I served the within document:

25       **REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF DEFENDANT BIC USA,
     INC.'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**
26

27

28                                  -1-

Gordon & Rees LLP
101 West Broadway, Suite 2000
San Diego, CA 92101

1

☐ **BY FACSIMILE, [Fed. Rule Civ. Proc. Rule 5(b)]** by sending a true copy from Gordon & Rees LLP's facsimile transmission telephone number (619) 696-7124 to the fax number(s) set forth below, or as stated on the attached service list. I am readily familiar with the firm's practice for sending facsimile transmissions, and know that in the ordinary course of Gordon & Rees LLP's business practice the document(s) described above will be transmitted by facsimile on the same date that it (they) is (are) placed at Gordon & Rees LLP for transmission.

☒ **BY U.S. MAIL [Fed. Rule Civ. Proc. Rule 5(b)]** by placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid, in United States mail in the State of California at San Diego, addressed as set forth below. I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after the date of deposit for mailing in affidavit.

☐ **BY ELECTRONIC FILING.** I caused all of the pages of the above-entitled document(s) to be electronically filed and served on designated recipients through the Electronic Case Filing system for the above-entitled case. The file transmission was reported as successful and a copy of the Electronic Case Filing Receipt will be maintained with the original document(s) in our office.

**John H Donboli**
Del Mar Law Group, LLP
322 Eighth Street
Suite 101
Del Mar, CA 92014
Email: jdonboli@delmarlawgroup.com

I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after the date of deposit for mailing in affidavit.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct. Executed on July 7, 2008, at San Diego, California.

Carolina Mendieta

-2-